[No. C016065. Third Dist. June 1, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
JACKIE DON WHITE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and IV.

COUNSEL

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Roger E. Venturi and Maureen A. Daly, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MORRISON, J.—In this case we examine the "provocative act" (or *Washington-Gilbert*) theory of murder, under which a person may be liable for the death of an accomplice. (*People* v. *Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130], *People* v. *Gilbert* (1965) 62 Cal.2d 690 [47 Cal.Rptr. 909, 408 P.2d 365].) A jury convicted defendant of murder under this theory and of other charges.[1] On appeal he urges evidentiary, instructional and sentencing error. We shall remand for resentencing and otherwise affirm.

FACTS

We use the term "victim" to refer to James Byrd and Anthony Martz, the young men whose desire for a night on the town led them to the brink of death. On January 16, 1992, they traveled to the City of Stockton to consort

---

[1]The unpublished portion of this opinion discusses the charges in detail.

with prostitutes in a seedy motel. The men rented a room at the Crest Motel on Wilson Way. Two prostitutes, Tamara "TJ" Ponton and Alicia Hinojos, approached Byrd in the parking lot and then went with the men to their room. Byrd packaged some marijuana which he hoped to trade for sex, and he prepared a bag of methamphetamines as well. He put these bags in a first aid kit which he took downstairs to put in his truck. The men offered the prostitutes lines of methamphetamines, but they would have sex only in exchange for cocaine, heroin or money. TJ left to turn a trick and Martz left to buy condoms, and to find a "better" prostitute.

When TJ returned to the room, Byrd relieved her of a linoleum knife. He also took a knife from Hinojos. Later, around 1 in the morning, Benny Gray and Charles Herbert came to the room and asked for TJ. TJ spoke with them and then invited them in. Byrd was preparing more bags of marijuana and methamphetamines. TJ indicated the situation was "cool." Byrd was not convinced, but offered the men samples of drugs. The parties discussed trading drugs for money or guns. Gray and Herbert left. Byrd told TJ that if they came back, only one man could enter the room at a time.

Byrd then drove TJ and Hinojos downtown so the prostitutes could get drugs and so he could try to sell marijuana. The youths needed cash because none of the various prostitutes they met would have sex for marijuana or methamphetamines, only cocaine or heroin, which the youths did not have. After the women acquired some heroin, the trio returned to the motel room. The prostitutes went into the bathroom to use their heroin.

Around 2 in the morning, with the prostitutes in the bathroom, TJ's friends struck. Gray, Herbert and defendant, Jackie Don White, barged in armed as follows: Gray with a handgun; Herbert with a baseball bat; and defendant with a stun gun.

Gray ordered the youths to the floor, then threw Byrd to the floor. The intruders were yelling for money, drugs and a gun. Gray stood over Byrd, pointing a gun at him and at one point kicked him in the head. Defendant shocked Martz with the stun gun and demanded to know where the money was. Defendant tore the room apart, then bludgeoned Martz and pushed his face into the carpet. Byrd, too, was shocked with the stun gun, then heard Martz being shocked again and pleading "Oh God, help me." When Byrd tried to get up he was pistol-whipped by Gray. He also thought he was hit with the bat.

Meanwhile, the prostitutes left the bathroom and searched bags and drawers in the bedroom. Byrd and Martz finally told the robbers there was

money in their truck and Herbert left to look. When Herbert could not find money, the three men resumed beating the youths. Then Martz told them to look under the seat of the truck. Once again Herbert found nothing and the beating continued.

After Herbert returned the second time, Byrd saw Gray look toward defendant and Herbert. He (Gray) then nodded and cocked his pistol, which was pointed at Byrd. Byrd thought this meant he was going to be killed.

Byrd, who had been a "pretty good" high school wrestler, grabbed Gray from behind and struggled with him. Both fought for control of the gun, Gray's finger was on the trigger and Byrd's finger was on top of Gray's. One shot went into the floor. Herbert and the prostitutes fled. Byrd turned the gun into Gray's neck. The gun fired, dropping Gray. Byrd held defendant at bay as he and Martz retreated from the room.

When the police arrived Byrd surrendered the gun. Defendant came out of the motel room and told the police he and his companions had been there simply to buy marijuana. Byrd, Martz and defendant were handcuffed. When asked who shot him, Gray, lying on the balcony spitting up blood, pointed to Byrd and said "that guy right there." In a short while, Gray died.

Additional facts will be supplied as necessary.

DISCUSSION

I

*The Murder Conviction.*

Defendant urges no substantial evidence supports his conviction for murder and the jury was misinstructed on the applicable murder theory. We will first outline the elements of the applicable murder theory. We will then conclude substantial evidence supports the conviction on this theory. Next, we will consider the adequacy of the instructions. Although we find an error of omission in the instructions, the error did not prejudice defendant.

A.   *Provocative Act Murder.*

██   The California Supreme Court has held the killing of an accomplice by a victim or peace officer is not a killing which occurs "in the perpetration of" the underlying felony, as required to invoke the felony-murder doctrine established by Penal Code section 189. (*People* v. *Washington, supra,* 62

Cal.2d 777, 781.) The Attorney General recognizes that we have no power to alter this application of the felony-murder rule. (See *id.* at pp. 785-791 (dis. opn. of Burke, J.).)

But *People* v. *Washington, supra,* 62 Cal.2d 777, does not hold that a robber is never liable for the lawful killing of an accomplice by a robbery victim or peace officer (see Pen. Code, § 197, subd. 1), only that murder liability cannot be predicated on a felony-murder theory.

In another significant case, the court enumerated certain rules applicable to this situation:

"(1) *Proof of malice aforethought.* 'Murder is the unlawful killing of a human being, with malice aforethought.' (Pen. Code, § 187.) Such malice is implied under Penal Code section 188 when the defendant or his accomplice ' "for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death." ' [Citations.] Initiating a gun battle is such an act.

"(2) *The killing must be attributable to the act of the defendant or his accomplice.* When the defendant or his accomplice, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and his victim or a police officer kills in reasonable response to such act, the defendant is guilty of murder. . . . [T]he victim's self-defensive killing or the police officer's killing in the performance of his duty cannot be considered an independent intervening cause for which the defendant is not liable, for it is a reasonable response to the dilemma thrust upon the victim of the policeman by the intentional act of the defendant or his accomplice. [Citations.]

"(3) *Vicarious criminal liability.* Under the rules defining principals and criminal conspiracies, the defendant may be guilty of murder for a killing attributable to the act of his accomplice. To be so guilty, however, the accomplice must cause the death of another human being by an act committed in furtherance of the common design." (*People* v. *Gilbert, supra,* 63 Cal.2d 690, 704-705, citations omitted, revd. on other grounds, *sub nom. Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]; reiterated in *People* v. *Caldwell* (1984) 36 Cal.3d 210, 216, fn. 2 [203 Cal.Rptr. 433, 681 P.2d 274].)

■ This describes the *"Washington-Gilbert"* or "provocative act" theory of murder, which is invoked when a victim or peace officer has killed a felon. There are two components to the provocative act theory: first, did defendant or a surviving accomplice commit life-threatening provocative acts beyond those necessary to commit the robbery? Second, did those acts

impel the victim to kill, i.e., were they the proximate cause of death? (See *People* v. *Mai* (1994) 22 Cal.App.4th 117, 124 [27 Cal.Rptr.2d 141].)

As for the first element, the California Supreme Court has decided several cases which separate acts subsumed within a robbery and those which exceed the ambit of a robbery and satisfy the *Gilbert* requirements. "[*Gilbert*] clearly held that resistance provoked only by the robbery itself is no basis for a finding of implied malice necessary for murder liability. Implicit in *Gilbert*, as in *Washington*, was the assumption that the life-threatening act on which that liability is premised must be something beyond the underlying felony itself and must be a proximate cause of death." (*In re Joe R.* (1980) 27 Cal.3d 496, 505 [165 Cal.Rptr. 837, 612 P.2d 927].) The defendant or surviving accomplice must have "intentionally committed acts which it was highly probable would result in death, manifesting a conscious disregard of human life, or malice." (*People* v. *Caldwell, supra,* 36 Cal.3d at p. 216.)

As for the second element, traditional notions of concurrent and proximate causation are used: "To be considered a *proximate* cause of [an accomplice's] death, the acts of the defendants must have been a 'substantial factor' contributing to the result." (*People* v. *Caldwell, supra,* 36 Cal.3d at p. 220; *People* v. *Superior Court (Bennett)* (1990) 223 Cal.App.3d 1166, 1173-1174 [273 Cal.Rptr. 71].)

With this brief understanding of the "provocative act" doctrine, we turn to defendant's contentions.

### B.  *Sufficiency of the Evidence.*

We must review the acts of defendant and his surviving accomplice to determine whether they committed acts in furtherance of the robbery which were life-threatening and were beyond those necessary to accomplish their criminal purpose. The acts of the dead robber may not be ascribed to defendant. (*People* v. *Antick* (1975) 15 Cal.3d 79, 91-92, & fn. 12 [123 Cal.Rptr. 475, 539 P.2d 43].)

As stated earlier, defendant shocked both victims with a stun gun and Herbert wielded the baseball bat. Both men participated fully in the severe, and protracted beatings. They each made demands for money, drugs and a gun. Defendant hit Martz in the face with the stun gun. Herbert hit Byrd with the bat. Both Byrd and Martz feared for their lives. Each time Herbert returned from searching the truck, the beatings resumed. Finally, upon seeing Gray cock his pistol, the victim, James Byrd, reacted by struggling with Gray for control of the gun.

Defendant claims no more was proven than the threats inherent in a robbery. He argues these facts do not establish a "provocative act" murder: "Appellant engaged in prior assaultive conduct, but blows to a robbery victim are not legally sufficient to support a murder conviction where they did not precipitate the use of deadly force." "While the actions of Herbert and appellant contributed to the tense situation, such tension is normally present in an armed robbery." Defendant challenges both the severity of the provocative conduct and the finding of causation.

Robbery, a taking by force or fear (Pen. Code, § 211), may be accomplished by accosting the victim with a threat of force and demanding property. But this case was not a traditional "uneventful holdup" consisting only of oral or visual demands. (See *Taylor* v. *Superior Court* (1970) 3 Cal.3d 578, 594 [91 Cal.Rptr. 275, 477 P.2d 131] (dis. opn. of Mosk, J.).) This was a severe, protracted, beating with deadly weapons. Such acts are well beyond those necessary for the commission of the robbery and were life-threatening. When the initial application of force and fear did not yield the expected results, defendant and his surviving accomplice tortured the victims by continually beating them while demanding money and drugs. The "robbers' demeanor suggested peculiar instability and a propensity for gratuitous violence" sufficient to support the provocative act doctrine. (*In re Joe R.*, *supra*, 27 Cal.3d at p. 508, explaining *Taylor*, *supra*, 3 Cal.3d 578.)

Defendant relies heavily on *In re Joe R.*, *supra*, 27 Cal.3d 496, in which a divided court reversed a juvenile adjudication of provocative act murder. That case is distinguishable. In *Joe R.* the minor and his accomplice approached the victim and the accomplice pulled a gun, announcing a robbery. The accomplice told the victim to walk behind some buildings and both robbers made repeated threats. When they got behind the buildings the accomplice ordered the victim to give his watch and coat to the minor. Then the accomplice gestured to an alley and said " 'Let's go back there.' " The victim, thinking he would be killed, grabbed the gun and began to fight. He felt a blow on the back of his head, presumably delivered by the minor. He eventually shot the accomplice and a petition alleging murder was sustained as to the minor. (*Id.* at pp. 501-503.)

The California Supreme Court reversed, reasoning that because the blow to the head was delivered *after* the victim began to fear for his life it did not *cause* his fear and hence, did not *cause* the accomplice's death. "Before the struggle began [the minor] had done no more than participate actively in an armed robbery. . . . Nothing he said or did suggested that [the victim] was going to be killed whether he cooperated or not. The minor simply voiced the threats already inherent in the dangerous felony. That alone is insufficient for a finding of *Washington-Gilbert* murder even when it helped

provoke the victim's lethal response." ( *In re Joe R.*, *supra*, 27 Cal.3d pp. 507-508, fn. omitted.)

The court in *In re Joe R.*, *supra*, 27 Cal.3d 496, did not hold that "prior assaultive conduct" was irrelevant, only that the facts of the case before it did not support the conclusion that the prior assaultive conduct caused the lethal response. The facts here are quite different because "before the struggle began" defendant herein and his surviving accomplice had already begun a brutal beating of the victims. *Joe R.* is of no aid to defendant.

In *People* v. *Caldwell*, *supra*, 36 Cal.3d 210, the defendant drove a getaway car containing two accomplices, Washington and Belvin. He drove recklessly until the car stopped near a patrol car. Washington pointed a gun at a peace officer, who rammed the getaway car with a patrol car. Another robber, Belvin, put his hand out the window of the getaway car; he was holding a pistol. Caldwell crouched behind the car door, holding a pistol. Eventually, an officer shot and killed Belvin. (*Id.* at pp. 215-216.) The court addressed the question whether Belvin's actions precipitated his own death, such that the previous acts of the other robbers were not a proximate cause of Belvin's death as required by the *Washington-Gilbert* doctrine:

"Though the deputies did not begin firing immediately, but gave the suspects an opportunity to drop their guns, it can hardly be said that whatever provocative force the high-speed chase and Washington's apparent attempt to shoot two policemen may have had dissipated, . . . The lull in the action was precarious and short-lived, and at least one deputy . . . did count the chase and the fact that Washington had 'produced' a weapon a few seconds before among his reasons for fearing for his and his compatriots' safety just after the suspects' car was stopped. Thus, a reasonable trier of fact could have concluded that the officers' lethal response was provoked by a violent confrontation which was the product of the actions of both Caldwell and Washington, as well as those of Belvin.

"The jury might also reasonably have inferred that Belvin would have been unwilling to provoke a gun battle if Caldwell had not similarly adopted an aggressive stance, refusing to drop his gun. It may have concluded that the co-felons' conduct reflected a common determination not to surrender, and the several acts of resistance were interdependent." (*People* v. *Caldwell*, *supra*, 36 Cal.3d at pp. 219-220, fns. omitted.)

Similarly, in this case, there was no break between the vicious beating administered by the robbers and the killing. The three robbers acted with a common purpose. Their acts were interdependent. As in *People* v. *Caldwell*,

*supra*, 36 Cal.3d 210, the whole course of conduct, involving severe beatings with weapons far exceeded the force necessary to accomplish robbery and operated upon Byrd's mind to cause him to fear for his life and kill Gray in self-defense.

Defendant fancifully states that "Neither appellant nor Herbert engaged in any act suggesting they would kill Byrd or Martz." A beating with a baseball bat combined with the use of a stun gun is the use of deadly force.

Viewed in the light favorable to the verdict, ample evidence supports defendant's liability for murder. The acts of defendant and his surviving accomplice were far beyond those necessary to merely rob the victims. Those acts operated on Byrd's mind, causing him reasonably to fear for his life and to kill Gray in self-defense. Defendant murdered his accomplice Benny Gray.

## C.   *Adequacy of the Instructions.*

■   Defendant contends the jury was given incorrect instructions on the provocative act theory. Specifically, he contends the court should have defined "provocative act" as "life-threatening" or "life endangering," as the defense requested.[3] We agree. However, we also agree with the Attorney General that the instructions given adequately conveyed the definition of the crime to the jury and the omission of the terms "life-threatening" and "life-endangering" from the instructions did not prejudice defendant.

The provocative act murder is a species of implied malice murder. We quote the jury instructions as given, with the requested but omitted material set forth in brackets: "A homicide committed during the commission or attempted commission of a crime by a person who is not a perpetrator of such crime, in a reasonable response to an intentional [life endangering] provocative act by a perpetrator of the crime is considered in law to be an unlawful killing by the perpetrators of the crime. Malice is implied when the provocative act [such life-threatening act beyond the acts necessary to commit the crime] was deliberately performed with knowledge of the danger to and with conscious disregard for human life."

---

[3]The alternate criminal jury instruction forms provided by Forecite, which are keyed to CALJIC numbers, contain such language. (See 2 Forecite (1994) Murder, § F8.12a, pp. 10-11.)

CALJIC has revised its instructions and now provides the following definition: "An intentional provocative act is an act which meets the standard for implied malice afore-thought, namely, [¶] 1. The act was intentional, [¶] 2. The natural consequences of the act were dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for human life." (CALJIC No. 8.12 (1994 rev.).)

The jury was then told that "aforethought" meant "the required mental state must precede rather than follow the provocative act," and the act "must be beyond the acts necessary to commit the crime itself. Where the lethal resistance is provoked by the underlying crime itself, and is not the result of an additional provocative act, there is no malice aforethought and thus no murder." Arming was not itself a sufficient provocation. A provocative act committed by the dead accomplice does not count.

The court then gave the following definition of the elements of murder, again with the requested but omitted material set forth in brackets:

"In order to prove such crime, each of the following elements must be proved:

"1.  The crime of attempted robbery or burglary was committed;

"2.  During the commission of such crime, a person committing the crime also intentionally committed a provocative [life endangering] act which act was not necessary to the commission of the attempted robbery or burglary;

"3.  The provocative [life endangering] act was deliberately performed with knowledge of the danger to and with conscious disregard for human life;

"4.  Such act was sufficiently provocative [and life endangering] that the victim of the attempted robbery or burglary, in a reasonable response thereto, killed a perpetrator of such crime, and

"5.  The provocative [life-endangering] act was a proximate cause of death."

The jury was then instructed on proximate cause, and told the murder was of the first degree if the perpetrators bore the specific intent to commit robbery or burglary.

The Attorney General concedes that the language of the instructions was not optimal. As noted (fn. 2, *ante*) CALJIC No. 8.12 has been modified along the lines proposed by defendant, to include the phrase "dangerous to human life." But even at the time of trial the law was settled that the provocative act must be life threatening and we accept the Attorney General's tacit concession of error. (See *People* v. *Mai*, *supra*, 22 Cal.App.4th at pp. 123-126.) However, the error of omission was harmless.

The jury was instructed that one of the elements of murder was that the "provocative act was deliberately performed with knowledge of the danger to and with conscious disregard for human life." There is simply no reasonable meaning of these words other than that the act must be "life threatening."

In *People* v. *Dellinger* (1989) 49 Cal.3d 1212 1221 [264 Cal.Rptr. 841, 783 P.2d 200], the court held that " 'wanton disregard for human life' " "would be understood by a reasonable juror to independently require a finding of the defendant's subjective awareness of the life-threatening risk." We see no significant difference between "wanton disregard" and "conscious disregard" as used herein. Because the jury was required to find defendant acted "with knowledge of the danger to" human life and "with conscious disregard for human life," a finding which a juror would understand to "require a finding of the defendant's subjective awareness of the life-threatening risk," the failure of the court to use the terms "life threatening" and "life endangering" in the instructions was harmless.

It is true, as defendant states, that the prosecutor misstated the law at closing argument, though the defense stated the law correctly. But the jury was instructed (CALJIC No. 1.00) to accept the law as given by the court. We presume the jury understood and followed this instruction. (See *People* v. *Romo* (1975) 47 Cal.App.3d 976, 990 [121 Cal.Rptr. 684], disapproved on another point in *People* v. *Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396].)

II

*The Claim of Right Defense.\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III

*Defendant's Admission in Open Court.*

Defendant did not testify. However, at a pretrial hearing he stated the witnesses had lied and the prosecutor knew that he (defendant) was not at the motel that night. This statement was introduced at trial over relevancy and Evidence Code section 352 objections. Defendant contends the evidence should not have been admitted. We disagree.

At the preliminary hearing the victims testified that it was defendant and Gray who went to the motel room the first time, not Herbert and Gray.

*See footnote, *ante*, page 758.

Defendant filed a motion to dismiss for discriminatory prosecution, based in part on his family's notoriety in the community and the fact that the first prosecutor in this case, Michael Platt, had prosecuted defendant's son for a different homicide. During the hearing on that motion defendant personally addressed the court on certain points. At one point the following colloquy occurred:

"Well, can you explain this to me, Judge, all of this: He [Platt] knows that these people lied on the witness stand. He knows his witnesses lied, all of them.

"Also what got me really perplexed is here's some guys coming in this town, bringing drugs in the town and flooding our community with drugs can kill a man and a Black man at that. It's like we're not worth nothing. It's all right for him to do that just so long as we get Jackie White.

"Your Honor, three weeks ago when I appeared in this courtroom, this man—

"THE COURT: By 'this man' you mean Mr. Platt?

"THE DEFENDANT: Mr. Platt. And my co-defendant he was like eased out of the picture, like let's get Jackie White. And the evidence show, [*sic*] Your Honor, clearly show, clearly show, these people lied and he knows it.

"This man is withholding information. He knows I wasn't at that motel. He knows that. [¶] . . . But he knows, he knows in his heart, he knows I wasn't at the motel. And these people got on the witness stand and these lies that was brought out he knows it."

Eual Blansett replaced Platt as the prosecutor at trial. He wanted to introduce portions of the above passage to show that defendant lied to the court by claiming never to have been at the motel. The trial court permitted the evidence to come in, but allowed the defense to try to explain that the statement "I wasn't at the motel" was a reference to the first visit by Gray and Herbert to the motel, and not to the second visit, when Gray, Herbert and defendant went to the motel.

Michael Platt, the prosecutor who had handled this case before trial, took the stand and testified as follows: at a hearing following the preliminary examination, the defendant made comments to the court. The defendant, referring to Platt, had said, "He knows I wasn't at that motel." and "[h]e knows, he knows in his heart, he knows I wasn't at the motel."

Defendant cross-examined Platt. Defendant suggested that the statement was taken out of context, in that defendant had also stated that witnesses had lied at the preliminary examination. Platt conceded that Byrd and Martz testified at the preliminary hearing that defendant arrived at the motel during the "first" visit. On redirect Platt testified that defendant did not qualify the scope of his statement that he was not at the motel to mean that he was not at the motel during the first visit there and did not limit the witnesses who had lied to Byrd and Martz.

■ On appeal defendant makes the argument that this testimony was irrelevant because "it was clear from the evidence that he was not with Gray when he visited the room the first time, but that rather Herbert was with Gray. A position that appellant was not in the room at the time of the second visit would have been completely untenable since appellant was arrested at the scene immediately after the shooting."

This provides an innocent explanation for defendant's statement: he was referring to and only to the first visit to the motel room, during which visit he was not present; Martz and Byrd lied at the preliminary hearing that he was present during that first visit and the prosecutor knew that.

But that is not the only plausible explanation. It may be that defendant was making a foolish effort to mislead the court by claiming that he was not even in the motel room. It was for the jury to resolve which of these meanings to attribute to the defendant's statements. If defendant is taken at his word, he lied, because he said, without qualification, that he was not at the motel room and the prosecutor knew the People's witnesses were lying. If the jury accepted this statement at face value, it was permitted to find the statement evidenced defendant's consciousness of guilt and was relevant evidence. (Evid. Code, § 210; *People* v. *Kimble* (1988) 44 Cal.3d 480, 495-498 [244 Cal.Rptr. 148, 749 P.2d 803]. See CALJIC No. 2.03)

Defendant seems to argue that a false statement by a defendant evidences consciousness of guilt if and only if the statement is made upon arrest. This is not correct. The inference of guilt comes from the fact that a falsehood was told in order to mislead the authorities and avoid suspicion, not the time at which the statement was made. For example, in *People* v. *Peete* (1921) 54 Cal.App. 333 [202 P. 51], the defendant was interviewed prior to the return of the indictment or her arrest "in the presence of the deputy district attorney and others," and the interview was transcribed. (*Id.* at pp. 340, 351.) In a passage instructive on the question herein, the court said: "Her declarations, when compared one with another, and particularly when considered in

connection with the facts . . . , appear to have been disingenuous fabrications concocted to serve the purpose of a red herring drawn across defendant's trail to throw the authorities off the scent. At any rate, they are of such a character that the jury would be justified in drawing the inference that such was their purpose. We would not have it understood that the interpretations which we have put upon the several statements . . . are the only legitimate constructions of which they are susceptible. It is possible that they could be viewed in a more charitable light and characterized less harshly. But, when analyzed and compared with all the facts in the case, they are reasonably subject to the inference that they are but false fabrications made with the preconceived design to thwart the efforts of the officers to solve the mystery of [the victim's] disappearance." (*Id.* at pp. 352-353.)

The point is not when the statement was made but whether the statement can be interpreted to be an effort to mislead. It is up to the jury to decide what to make of an ambiguous statement which might be an effort to conceal guilt or might be innocent. If the jury accepted defendant's explanation (via counsel) for the statement, it would not believe defendant had lied and admission of the statement could not have worked to defendant's prejudice.

Defendant complains about the prosecutor's argument on this point. In part the prosecutor stated, "He's willing to lie in an attempt to make a point before a judge." There was nothing improper about the prosecutor's attempt to portray defendant as a liar: if the jury accepted defendant's pretrial statement on its face, defendant *was* a liar and was trying to mislead the court, which the jury may have found showed his consciousness of guilt. If it accepted defendant's explanation, it would disregard the prosecutor's argument as not based on the evidence. Either way there was no prejudice.

To the extent the opening brief may be read to allege other errors regarding the prosecutor's argument, defendant has disclaimed those issues in his reply brief. Therefore, we have no need to discuss them.

IV

*Sentencing Claims.**

. . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 758.

## Disposition

The cause is remanded for resentencing in accordance with this opinion. In all other respects the judgment is affirmed.

Sims, Acting P. J., and Davis, J., concurred.

A petition for a rehearing was denied June 28, 1995, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied September 14, 1995.