[No. S083267. Aug. 27, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
ISRAEL CERVANTES, Defendant and Appellant.

COUNSEL

Philip M. Brooks, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Robert M. Foster, Keith I. Motley and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BAXTER, J.—This case presents a question concerning proof of proximate causation in a provocative act murder case. We granted review to decide

whether defendant, a member of a street gang, who perpetrated a nonfatal shooting that quickly precipitated a revenge killing by members of an opposing street gang, is guilty of murder on the facts before us. We conclude that he is not.

## FACTS AND PROCEDURAL HISTORY

Shortly after midnight on October 30, 1994, defendant and fellow Highland Street gang members went to a birthday party in Santa Ana thrown by the Alley Boys gang for one of their members. Joseph Perez, the prosecution's gang expert, testified the Highland Street and Alley Boys gangs were not enemies at the time. Over 100 people were in attendance at the party, many of them gang members.

Outside of the house, defendant approached a woman he knew named Grace. She was heavily intoxicated and declined defendant's invitation to go to another party with him, which prompted him to call her a "ho," leading, in turn, to an exchange of crude insults. Juan Cisneros, a member of the Alley Boys, approached and told defendant not to "disrespect" his "homegirl." Richard Linares, also an Alley Boy, tried to defuse the situation, but Cisneros drew a gun and threatened to "cap [defendant's] ass." Defendant responded by brandishing a handgun of his own,[1] which prompted Linares to intervene once again, pushing or touching defendant on the shoulder in an effort to separate him from Cisneros. In response, defendant stated "nobody touches me" and shot Linares through the arm and chest.

A crowd of some 50 people was watching these events unfold. Someone yelled, "Why did you shoot my home boy?" or "your home boy shot your own homeboy," to which someone responded "Highland [Street] is the one that shot." A melee erupted, and gang challenges were exchanged.

A short time later[2] a group of Alley Boys spotted Hector Cabrera entering his car and driving away. Recognizing him as a member of the Highland Street gang, they fired a volley of shots, killing him. A variety of shell casings recovered from the street evidenced that at least five different shooters had participated in the murder of Cabrera.

Perez testified that although the Highland Street and Alley Boys gangs were not enemies at the time of the shootings, both gangs would be expected to be armed. He opined that the Alley Boys would consider defendant's

---

[1]Defendant testified someone slipped the gun into his pocket and warned him in Spanish to "be careful."

[2]The witnesses' time estimates varied from several seconds to a minute or two.

conduct in shooting Linares to be an act of "major disrespect" to their gang. To avenge the shooting, they would be expected to respond quickly with equal or greater force against defendant or another member of his gang. Therefore, Perez opined, Cabrera's death was a reasonably foreseeable consequence of defendant's actions.

Defendant testified he did not intend to shoot Linares, but was simply trying to protect himself from Cisneros, who drew his weapon first. He was surprised when his gun went off, because he did not feel it fire or see any flash. He testified, "I don't know if I shot [Linares] or somebody else shot [him], but what I do know is that if I [had] attempted to murder anybody, I would have shot [him] while he was on the floor." In the confusion following the shooting of Linares, defendant heard someone say, "[Y]our home boy shot your own home boy," and then he heard someone say "Highland's the one that shot." Realizing he was in danger, defendant ran from the party and sped off with several others. He heard shots being fired as they drove away. He was stopped by police and arrested a short distance away.

Defendant was charged with murdering Cabrera. (Pen. Code, § 187.)[3] The relevant instructions informed the jury that murder is unlawful homicide with malice aforethought,[4] that malice could be implied from the deliberate doing of a dangerous act with indifference to human life,[5] and that the doing of a provocative act that resulted in death could be such an act.[6]

---

[3] All further statutory references are to this code unless otherwise indicated. Defendant was also charged with and and convicted of the attempted murder of Linares (§§ 664, 187), enhanced with findings that he personally used a firearm (*id.*, § 12022.5) and committed the offense for the benefit of a street gang (*id.*, § 186.22), illegal possession of a firearm (*id.*, § 12021, subds. (d) & (e)), and possession of methamphetamine (Health and Saf. Code, § 11379). On appeal he challenged only his conviction of murder (his further claims of sentencing error were rejected and are not at issue on review).

[4] "Every person who unlawfully kills a human being with malice aforethought is guilty of . . . murder . . . .

"In order to prove such crime, each of the following elements must be proved:

"1. A human being was killed;

"2. The killing was unlawful; and

"3. The killing was done with malice aforethought." (See CALJIC No. 8.10.)

[5] " 'Malice' may be either express or implied. [¶] . . . [¶]

"Malice is implied when:

"1. The killing resulted from an intentional act,

"2. The natural consequences of the act are dangerous to human life, and

"3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (See CALJIC No. 8.11.)

[6] "A homicide committed during the commission of a crime by a person who is not a perpetrator of such crime, in response to an intentional provocative act by a perpetrator of the crime other than the deceased, is considered in law to be an unlawful killing by the surviving perpetrator of the crime.

The jury was further instructed that liability for homicide requires a causal connection between an unlawful act and death, namely, that the act's direct, natural and probable consequences must be death.[7] Pursuant to *People v. Roberts* (1992) 2 Cal.4th 271 [6 Cal.Rptr.2d 276, 826 P.2d 274] (*Roberts*), the jury was instructed that a direct, natural and probable consequence must be reasonably foreseeable, measured objectively under a reasonable person test.[8]

As relevant here, the jury convicted defendant of the murder of Cabrera, fixed at second degree.

## DISCUSSION

██ Provocative act murder was the sole theory under which defendant was tried and convicted of the murder of Hector Cabrera. At the close of evidence, defendant sought judgment of acquittal (§ 1118.1) on the murder charge for want of "sufficient evidence of a provocative act to permit the

"An intentional provocative act is defined, as follows:

"1. The act was intentional,

"2. The natural consequences of the act were dangerous to human life, and

"3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for human life.

"In order to prove such crime, each of the following elements must be proved:

"1. The crime of assault with a firearm or attempted voluntary manslaughter or attempted murder was committed;

"2. During the commission of the crime the defendant also committed an intentional provocative act;

"3. Another person not a perpetrator of the crime of assault with a firearm or attempted voluntary manslaughter or attempted murder, in response to the provocative act, killed another person; .

"4. The defendant's commission of the intentional provocative act was a cause of the death of Hector Cabrera.

"If you find that the crime of murder was committed, you must find it to be murder of the second degree." (See CALJIC No. 8.12.)

[7]"To constitute the crime of Murder there must be in addition to the death of Hector Cabrera an unlawful act which was a cause of that death.

"The criminal law has its own particular way of defining cause. A cause of the death of Hector Cabrera is an act that sets in motion a chain of events that produces, as a direct, natural and probable consequence of the act, the death of Hector Cabrera, and without which the death would not occur." (See CALJIC No. 3.40.)

[8]The jury was told that "A direct, natural and probable consequence is defined as a consequence which is reasonably foreseeable. The defendant need not intend that the ultimate crime be committed, nor need he even personally foresee that it may be committed. It is enough that objectively it is reasonably foreseeable that the ultimate crime may occur. [¶] With respect to the foreseeability of the ultimate result, the issue does not turn on the defendant's subjective state of mind but depends upon whether, under all the circumstances presented, a reasonable person in the defendant's position would have or should have known that the ultimate result was a reasonably foreseeable consequence of the intended crime."

jury to find the defendant liable for the death of Hector Cabrera." The trial court denied the motion.[9]

On appeal, defendant urged that the facts are insufficient as a matter of law to support his conviction of provocative act murder. In affirming the conviction, the Court of Appeal commented, "We have considerable difficulty with an argument which concedes this was a 'pure, deliberate revenge killing,' yet tries to distance itself from the concept of provocative act. We see no reason the provocative act doctrine should not apply." "Granted, a couple of minutes may have elapsed between the time Linares and Cabrera were shot. However, during this relatively brief interval, the potential for violence escalated rapidly as gang members drew weapons and issued threats. And as soon as the Alley Boys spotted their target (Cabrera), they wasted no time exacting their deadly revenge. Because Cervantes set in motion a fast-moving chain of events which led directly to Cabrera's death, it is immaterial the killing occurred a few minutes after the provocative act."

The question before us is, therefore, whether sufficient evidence supports defendant's conviction of murder based on the provocative act murder theory. ■ Viewing the evidence in the light most favorable to the guilty verdict secured by the prosecution, we must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (See, e.g., *People v. Staten* (2000) 24 Cal.4th 434, 460 [101 Cal.Rptr.2d 213, 11 P.3d 968].) ■ In particular, the essential element with which we are here concerned is proximate causation in the context of a provocative act murder prosecution.

■ In homicide cases, a "cause of the death of [the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur." (See CALJIC No. 3.40.) In general, "[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating." (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 36, p. 242.) ■ In this case there was an intervening force in operation—at least five persons in attendance at the party, presumably all members of the Alley Boys, shot and killed Highland Street gang member Hector Cabrera in a hail of bullets shortly after the melee erupted. But that does not end our inquiry, because the "defendant may also be criminally liable for a

[9]Defendant also sought to have the jury instructed that in order to convict him of provocative act murder it had to find the Alley Boys' response to his provocative act was "reasonable." The trial court denied the request to modify the standard provocative act murder instruction. (CALJIC No. 8.12.)

result directly caused by his or her act, even though there is another contributing cause." (*Id.*, § 37, p. 243; see also CALJIC No. 3.41.)

Beginning with *People v. Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130] (*Washington*), and *People v. Gilbert* (1965) 63 Cal.2d 690 [47 Cal.Rptr. 909, 408 P.2d 365] (*Gilbert*), reversed on grounds not relevant here *sub nom. Gilbert v. California* (1967) 388 U.S. 263 [87 S.Ct. 1951, 18 L.Ed.2d 1178], we have applied principles of implied malice murder to situations in which criminal defendants neither kill nor intend to kill, but cause a third party to kill in response to their life-threatening provocative acts. The provocative act murder doctrine was originally conceived as a form of implied malice murder, derived as an offshoot of the felony-murder rule. (See *Washington, supra,* 62 Cal.2d at p. 782 ["Defendants who initiate gun battles may also be found guilty of murder if their victims resist and kill. Under such circumstances, 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death' [citation], and it is unnecessary to imply malice by invoking the felony-murder doctrine."].)[10]

The provocative act murder doctrine has traditionally been invoked in cases in which the perpetrator of the underlying crime instigates a gun battle, either by firing first or by otherwise engaging in severe, life-threatening, and usually gun-wielding conduct, and the police, or a victim of the underlying crime, responds with privileged lethal force by shooting back and killing the perpetrator's accomplice or an innocent bystander. (See, e.g., *Washington, supra,* 62 Cal.2d 777 [robbery victim kills accomplice]; *Gilbert, supra,* 62 Cal.2d 690 [police officer kills accomplice].)[11] In both *Gilbert* and *Washington*, the defendants' provocative acts consisted of starting a gun battle during

---

[10]The doctrine does not itself define a crime, as that is a legislative function. (§ 6; see *Keeler v. Superior Court* (1970) 2 Cal.3d 619, 631-632 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].) Instead, it is a descriptive category or shorthand formula denoting certain circumstances under which a defendant comes within the statutory definition of murder when his or her unlawful conduct provokes another into committing the fatal act. (See *post*, at p. 872, fn. 15.)

[11](See also *People v. Caldwell* (1984) 36 Cal.3d 210 [203 Cal.Rptr. 433, 681 P.2d 274] [police officer kills accomplice]; *Taylor v. Superior Court* (1970) 3 Cal.3d 578 [91 Cal.Rptr. 275, 477 P.2d 131] [robbery victim kills accomplice], overruled on another ground in *People v. Antick* (1975) 15 Cal.3d 79, 92, fn. 12 [123 Cal.Rptr. 475, 539 P.2d 43]; *People v. Garcia* (1999) 69 Cal.App.4th 1324 [82 Cal.Rptr.2d 254] [home invasion robbery victim kills accomplice]; *People v. Kainzrants* (1996) 45 Cal.App.4th 1068 [53 Cal.Rptr.2d 207] [robbery victim shoots back, killing covictim]; *People v. White* (1995) 35 Cal.App.4th 758 [41 Cal.Rptr.2d 510] [robbery victim kills accomplice]; *People v. Mai* (1994) 22 Cal.App.4th 117 [27 Cal.Rptr.2d 141] [robbery victim kills accomplice], disapproved on another ground in *People v. Nguyen* (2000) 24 Cal.4th 756, 761 [102 Cal.Rptr.2d 548, 14 P.3d 221].)

In *Pizano v. Superior Court* (1978) 21 Cal.3d 128 [145 Cal.Rptr. 524, 577 P.2d 659], we held that the provocative act murder doctrine could be applied where the "shield" victim of a

a robbery, causing a victim or a police officer to shoot and kill another. In *Washington* we were concerned mainly with distinguishing the doctrine from felony-murder liability. It was in *Gilbert* that we first developed the provocative act theory of murder liability more fully. One of defendant's accomplices started a gun battle and a police officer mortally wounded another accomplice in response. After deciding the jury had been improperly instructed in matters not relevant here, we articulated "principles [that] may be invoked to convict a defendant of . . . murder for a killing committed by another." (*Gilbert, supra*, 63 Cal.2d at p. 704.)

We first explained there must be proof of malice aforethought; in Gilbert's case implied malice. "When the defendant or his accomplice, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and his victim or a police officer kills in reasonable response to such act, the defendant is guilty of murder. In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life." (*Gilbert, supra*, 63 Cal.2d at p. 704.)

We then discussed causation: "[T]he victim's self-defensive killing or the police officer's killing in the performance of his duty cannot be considered an independent intervening cause for which the defendant is not liable, for it is a reasonable response to the dilemma thrust upon the victim or the policeman by the intentional act of the defendant or his accomplice." (*Gilbert, supra*, 63 Cal.2d at p. 705.)

In short, *Gilbert* described provocative act murder liability in traditional terms of proximate causation and malice, and as regards the former component, implicitly reaffirmed the general rule that no criminal liability attaches to an initial remote actor for an unlawful killing that results from an independent intervening cause (i.e., a superseding cause). In contrast, when the death results from a dependent intervening cause, the chain of causation

---

residential robbery was shot and killed *by a neighbor* who was trying to prevent the robbers from escaping. We explained that "the principles announced in *Gilbert* and its progeny are not limited to cases in which the person actually committing the homicide is either a victim of the felony or a police officer." (*Id.* at p. 136.) Several recent cases have invoked the doctrine when the provoked shooter who responds with deadly force to the defendant's felonious and life-threatening provocative conduct is himself engaged in criminal conduct. (See, e.g., *In re Aurelio R.* (1985) 167 Cal.App.3d 52 [212 Cal.Rptr. 868] [A minor and his fellow gang members drove into rival gang territory armed and intent upon exacting revenge for an earlier attack on one of their own. In the ensuing gun battle, one of the minor's accomplices was killed by rival gang member.]; *People v. Gardner* (1995) 37 Cal.App.4th 473 [43 Cal.Rptr.2d 603] [the defendant, a drug dealer, shot at the victim, also a drug dealer, who in the course of fleeing defendant's shots was fatally gunned down by yet a third armed drug dealer who believed defendant's shots were being fired at him].)

ordinarily remains unbroken and the initial actor is liable for the unlawful homicide.

This basic principle of proximate causation was articulated over a century ago in our decision in *People v. Lewis* (1899) 124 Cal. 551 [57 P. 470]. There the defendant had shot the victim in the intestines, sending him toward a painful and inevitable death he apparently decided to hasten by slitting his own throat. We held Lewis was properly convicted of manslaughter because the victim's response, though suicidal, was natural and understandable; hence it was not an independent intervening cause of death. Even "if the deceased did die from the effect of the knife wound alone, no doubt the defendant would be responsible, if it was made to appear, and the jury could have found from the evidence, that the knife wound was caused by the wound inflicted by the defendant in the natural course of events." (*Id.* at p. 555.) By contrast, we posed, "Suppose one assaults and wounds another intending to take life, but the wound, though painful, is not even dangerous, and the wounded man knows that it is not mortal, and yet takes his own life to escape pain, would it not be suicide only?" (*Id.* at p. 556.) The answer would be yes, and there would be no homicide liability, if "[t]he wound induced the suicide, but the wound was not, in the usual course of things, the cause of the suicide" (*ibid.*)—in other words, if death would not have inevitably followed and instead occurred through the independent intervening cause of the victim's own will to die.

The principle was revisited in *People v. Fowler* (1918) 178 Cal. 657 [174 P. 892] (*Fowler*), disapproved on another ground in *People v. Thomas* (1945) 25 Cal.2d 880, 901 [156 P.2d 7]. Fowler bludgeoned Duree with a club and left him lying in the road, where a motorist subsequently drove over him. We explained it did not matter whether the immediate instrumentality of death was Fowler's club or the motorist's car, because so long as the driver did not purposely drive over Duree, Fowler's acts proximately caused Duree's death. Therefore, Fowler's liability varied in accordance with his intent, i.e., criminal mens rea, in committing the conduct that proximately caused Duree's death; he could be guilty of murder, manslaughter, or no crime at all. (*Fowler, supra,* 178 Cal. at p. 669.)

More recently, in *Roberts, supra,* 2 Cal.4th 271, we reiterated that, "The criminal law thus is clear that for liability to be found, the cause of the harm not only must be direct, but also not so remote as to fail to constitute the natural and probable consequence of the defendant's act." (*Id.* at p. 319.) "Commentators and drafters have made this conclusion explicit." (*Ibid.*; see Perkins & Boyce, Criminal Law (3d ed. 1982) § 9, p. 774; Model Pen. Code, § 2.03, subd. (2)(b) [when purpose or knowledge of a result is an element of

an offense, the actor is not liable for an unintended or uncontemplated result unless, as relevant here, "the actual result involves the same kind of injury or harm as that designed or contemplated and is not too remote or accidental in its occurrence to have a . . . bearing on the actor's liability or on the gravity of his offense"].)

In *Roberts* a state prison inmate walked down a corridor as his fellow inmates, including the defendant, lounged against the walls on both sides. He was attacked and emerged with 11 stab wounds that shortly caused his death. The dying inmate, in an "unconscious state brought on by hypovolemic shock," grabbed a knife from the floor and pursued one of his assailants up a flight of stairs to the second floor where he reflexively plunged the knife into the chest of a prison guard, killing him. (*Roberts, supra,* 2 Cal.4th at p. 316, fn. 9; *id.,* pp. 294-295.) The defendant was charged with the murder of both the inmate and the correctional officer. Although ultimately reversing for instructional error, we found the evidence sufficient for the jury to find the defendant's acts were a proximate cause of the officer's death. (*Id.* at p. 321.)

We placed reliance in *Roberts* on several out-of-state authorities. In an early Illinois case, *Belk v. The People* (1888) 125 Ill. 584 [17 N.E. 744], the defendants were alleged to have negligently allowed their team of horses to break loose on a narrow country lane. The team collided with a wagon in plain sight just ahead, causing that wagon's team of horses to panic and run away and thereby throwing the victim, a passenger, to her death. The Illinois court reversed the resulting manslaughter convictions on other grounds, but reasoned that " 'Between the acts of omission or commission of the defendants, by which it is alleged the collision occurred, and the injury of the deceased, there was not an interposition of a human will acting independently . . . or any extraordinary natural phenomena, to break the causal connection.' " (*Roberts, supra,* 2 Cal.4th at p. 318, quoting *Belk, supra,* 17 N.E. at p. 745.) We also cited *Madison v. State* (1955) 234 Ind. 517 [130 N.E.2d 35], in which "the court found implied malice and affirmed a conviction of second degree murder when the defendant threw a hand grenade at one Couch who, presumably impulsively [i.e., instinctively and not as an act of will], kicked it to another who was killed. 'The fact that Couch kicked the grenade did not break the line of causation.' . . ." (*Roberts, supra,* at p. 319.) And we recalled *Wright v. State* (Fla.Dist.Ct.App. 1978) 363 So.2d 617, wherein the defendant was convicted of manslaughter for firing from his car into his intended victim's car. The intended victim had " 'rapidly accelerated his car while "ducking bullets" ' ' " and fatally ran over a pedestrian. (*Roberts, supra,* at p. 319, quoting *Wright, supra,* at p. 618.) We found the significance of the facts and holding in *Wright* to be as follows:

"Shots that cause a driver to accelerate impulsively and run over a nearby pedestrian suffice to confer liability [citing *Wright*]; but if the driver, still upset, had proceeded for several miles before killing a pedestrian, at some point the required causal nexus would have become too attenuated for the [shooter] to be liable even for manslaughter, much less for first degree murder." (*Roberts, supra*, 2 Cal.4th at p. 321.)

█ The principles derived from these and related authorities have been summarized as follows. "In general, an 'independent' intervening cause will absolve a defendant of criminal liability. (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 131, p. 149.) However, in order to be 'independent' the intervening cause must be 'unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause.' (*People* v. *Armitage* (1987) 194 Cal.App.3d 405, 420-421 [239 Cal.Rptr. 515].) On the other hand, a 'dependent' intervening cause will not relieve the defendant of criminal liability. 'A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is "dependent" and not a superseding cause, and will not relieve defendant of liability. [Citation.] "[ ] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. [ ] The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act." [Citation.]' (*People* v. *Harris* (1975) 52 Cal.App.3d 419, 427 [125 Cal.Rptr. 40].)" (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1523 [28 Cal.Rptr.2d 758]; see also *People v. Hansen* (1997) 59 Cal.App.4th 473, 479 [68 Cal.Rptr.2d 897]; *People v. Schmies* (1996) 44 Cal.App.4th 38, 49 [51 Cal.Rptr.2d 185]; *People v. Hebert* (1964) 228 Cal.App.2d 514, 520 [39 Cal.Rptr. 539].)

One commentary has described the rationale for finding the acts of a second party to be a remote, independent intervening (and superseding) cause in these terms: "The free, deliberate, and informed intervention of a second person, who intends to exploit the situation created by the first, but is not acting in concert with him, is normally held to relieve the first actor of criminal responsibility." (Hart & Honoré, Causation in the Law (2d ed. 1985) p. 326, fn. omitted.)

In *Roberts* we explained that "there is no bright line demarcating a legally sufficient proximate cause from one that is too remote. Ordinarily the question will be for the jury, though in some instances undisputed evidence may reveal a cause so remote that a court may properly decide that no

rational trier of fact could find the needed nexus. [Citations.]" (*Roberts, supra,* 2 Cal.4th at p. 320, fn. 11.) Perkins and Boyce suggest that, in the latter situation, "The matters of policy which determine just where the limitations of juridical recognition shall be placed upon the broad field of actual cause, are grounded . . . partly upon notions of fairness and justice. . . ." (Perkins & Boyce, Criminal Law, *supra,* § 9, p. 776, fn. omitted.)

■ Turning to the facts at hand, we agree with defendant that the evidence introduced below is insufficient as a matter of law to support his conviction of provocative act murder, for it fails to establish the essential element of proximate causation. The facts of this case are distinguishable from the classic provocative act murder case in a number of respects. Defendant was not the initial aggressor in the incident that gave rise to the provocative act.[12] There was no direct evidence that Cabrera's unidentified murderers[13] were even present at the scene of the provocative act, i.e., in a position to actually witness defendant shoot Linares. Defendant himself was not present at the scene where Cabrera was fatally gunned down; the only evidence introduced on the point suggests he was already running away from the party or speeding off in his car when the victim was murdered.[14]

But the critical fact that distinguishes this case from other provocative act murder cases[15] is that here the actual murderers were not responding to

[12]The evidence established that Cisneros confronted defendant for "disrespecting" his "homegirl," and first pulled out his weapon with which he threatened defendant. It was never the theory of the People's case that defendant's act of talking to Grace, a woman he knew who was associated with the Alley Boys, or even his calling her a "ho" when she refused his overtures, was itself a provocative act that would foreseeably give rise to threats of violence from the Alley Boys, much less escalate into a shooting and a retaliatory murder. The testimony of the prosecution's own gang expert was to the effect that the Highland Street and Alley Boys gangs were not enemies; that the fact members of both gangs were jointly in attendence at the party reflected they were peacefully coexisting; and that the fact that there was conversation instead of immediate shooting when the situation escalated to pushing and shoving and the display of guns reflected the participants were not enemies.

[13]As noted, ballistics evidence supported the inference that Cabrera was murdered by several individuals. Although there was some evidence that Cisneros and prosecution witness Francisco Guluarte were among the actual shooters, they were not prosecuted for Cabrera's murder, nor did the prosecution in any way seek to use their possible complicity in the murder to establish its case-in-chief against defendant for provocative act murder.

[14]In his closing argument, the prosecutor conceded to the jury, "He [Cabrera] starts running to where his car's parked. And to tell you the truth, I don't know where that is but I can tell you where it ended up."

[15]We have explained that in *Washington* and *Gilbert* we first applied principles of implied malice murder and intervening-act causation to situations in which criminal defendants neither killed nor intended to kill, but instead caused a third party to kill *in response* to their life-threatening provocative acts. (*Ante,* at p. 867.) The traditional provocative act factual pattern is but a subset of those homicide cases in which death results through the acts of an

defendant's provocative act by shooting back at him or an accomplice, in the course of which someone was killed. They were not in the shoes of the police officers in *Gilbert* or *Caldwell* who shot back and killed an accomplice as an objectively "reasonable response to the dilemma thrust upon [them]" by the defendant's malicious and life-endangering provocative acts. (*Gilbert, supra,* 63 Cal.2d at p. 705; *People v. Caldwell, supra,* 36 Cal.3d at pp. 219-223.) Nor were they acting without volition as was the inmate in *Roberts* who, having been rendered unconscious from stab wounds inflicted by defendant Roberts, "reflexively" responded by stabbing a prison guard to death (*Roberts, supra,* 2 Cal.4th at p. 321), or as was the intermediary in *Madison v. State, supra,* 234 Ind. 517 [130 N.E.2d 35], who instinctively kicked away a live hand grenade thrown at him by defendant Madison, resulting in the death of another.

---

intermediary. In all homicide cases in which the conduct of an intermediary is the actual cause of death, the defendant's liability will depend on whether it can be demonstrated that his own conduct *proximately caused* the victim's death—i.e., whether it can be shown that the intermediary's conduct was merely a dependent intervening cause of death, and not an independent superseding cause. If proximate causation is established, the defendant's level of culpability for the homicide in turn will vary in accordance with his criminal intent.

Although cases like *Fowler, Roberts* and *Madison* are intervening-act causation homicide cases in that the victims' deaths came at the hands of an intermediary, it would be a misnomer to label them provocative act murder cases. Neither the unidentified driver who ran over the victim left in the roadway in *Fowler,* the inmate who unconsciously and reflexively stabbed the prison guard in *Roberts,* nor the intermediary who instinctively kicked the hand grenade away from himself in *Madison,* were "provoked" into taking their deadly actions in the sense that the police officers in *Gilbert, supra,* 62 Cal.2d 690, and *People v. Caldwell, supra,* 36 Cal.3d 210, were provoked into shooting back during the robberies involved in those cases. Because the provocative act murder theory was derived in the context of felony-murder factual scenarios (usually robberies) and was specifically conceived as a caveat to the felony-murder rule, confusion can be avoided if use of the term "provocative act murder" is reserved for that category of intervening-act causation cases in which, during commission of a crime, the intermediary (i.e., a police officer or crime victim) is provoked by the defendant's conduct into shooting back, resulting in someone's death. In the classic provocative act murder prosecution, *malice is implied* from the provocative act, and the resulting crime is murder in the second degree. (§§ 187, 188; 1 Witkin & Epstein, Cal. Criminal Law, *supra,* Crimes Against the Person, § 148, p. 762 et seq.; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1221 [264 Cal.Rptr. 841, 783 P.2d 200].) But whether or not a defendant's unlawful conduct is "provocative" in the literal sense, when it proximately causes an intermediary to kill through a dependent intervening act, the defendant's liability for the homicide will be fixed in accordance with his criminal mens rea. If the defendant proximately causes a homicide through the acts of an intermediary and does so with malice and premeditation, his crime will be murder in the first degree (see § 189 ["All murder which is perpetrated . . . by any . . . kind of willful, deliberate, and premeditated killing . . . is murder of the first degree."]; *Gilbert, supra,* 63 Cal.2d at p. 705), irrespective of whether his conduct, in a literal sense, provoked the intermediary into killing. If the defendant proximately causes a homicide through the acts of an intermediary and does so without malice, his crime will be manslaughter (see, e.g., *People v. Schmies, supra,* 44 Cal.App.4th at p. 58), once again, irrespective of whether the conduct, in a literal sense, provoked the intermediary into taking deadly action.

To the contrary, the acts of the actual murderers here were themselves criminal, felonious, and perpetrated with malice aforethought. The fatal shots were fired, not at the defendant or an accomplice, but instead at a third party (Cabrera) who was not a party to the initial provocative act.[16] It can further be said that the murderers of Cabrera "intend[ed] to exploit the situation created by [defendant], but [were] not acting in concert with him," a circumstance that is "normally held to relieve the first actor [defendant] of criminal responsibility." (Hart & Honoré, Causation in the Law, *supra,* at p. 326, fn. omitted.) In short, nobody forced the Alley Boys' murderous response in this case, if indeed it was a direct response to defendant's act of shooting Linares. The willful and malicious murder of Cabrera at the hands of others was an independent intervening act on which defendant's liability for the murder could not be based.

The circumstance that the murder occurred a very short time after defendant shot Linares, and the opinion of prosecution gang expert Perez that Cabrera's murder was a foreseeable consequence of defendant's shooting of Linares in the context of a street gang's code of honor mentality, was essentially the only evidence on which the jury was asked to find that Cabrera's murder was "a direct, natural, and probable consequence" (CALJIC No. 3.40) of defendant's act of shooting Linares. Given that the murder of Cabrera by other parties was itself felonious, intentional, perpetrated with malice aforethought, and directed at a victim who was not involved in the original altercation between defendant and Linares, the evidence is insufficient as a matter of law to establish the requisite proximate causation to hold defendant liable for murder.

## CONCLUSION

The judgment of the Court Appeal is reversed to the extent it affirms defendant's conviction of murder; in all other respects it is affirmed, and the matter remanded for further proceedings consistent with the views expressed herein.

George, C. J., Kennard, J., Chin, J., and Brown, J., concurred.

---

[16]We have noted there was no evidence that either Cabrera or his murderers were present at or directly witnessed the incident in which defendant shot Linares at the side of the house. Nor is there any evidence in the record characterizing Cabrera's own conduct when pandemonium broke out and gang challenges were being exchanged; we know only that he was fatally shot as he attempted to drive away.

**KENNARD, J.**—I concur in the judgment and in the majority opinion for the reasons stated in my concurring opinion in the companion case of *People v. Sanchez* (2001) 26 Cal.4th 834 [111 Cal.Rptr.2d 129, 29 P.3d 209].

Werdegar, J., concurred.