Filed 9/5/13  P. v. Reynolds CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046212 |
| v. | (Super. Ct. No. 08NF4115) |
| CHARLES MICHAEL REYNOLDS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed.

J. Courtney Shevelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Charles Michael Reynolds of first degree murder, premeditated attempted murder, two counts of robbery and active participation in a criminal street gang. The jury also found true allegations Reynolds committed the murder during a robbery and while being an active participant in a criminal street gang, vicariously discharged a firearm causing great bodily injury and death, and committed all crimes for the benefit of, at the direction of, or in association with the Rollin 20's criminal street gang. The trial court sentenced Reynolds to life without the possibility of parole for the murder, plus 25 years for vicarious use of a gun, imposed concurrent prison terms for the attempted murder and robberies, and stayed imposition of sentence for active participation in a criminal street gang pursuant to Penal Code section 654.

Reynolds argues the trial court violated his state and federal Constitutional right to due process of law by admitting an in-court eyewitness identification which was the result of an impermissibly suggestive photographic lineup introduced in a codefendant's earlier trial.[1] He also asserts the trial court prejudicially erred by not giving CALCRIM No. 240 on causation. We find no error on either point and affirm.

FACTS

After an evening of revelry at the Boogie nightclub in Anaheim, Armand Jones, Giovanni Boyd, Dwayne Washington and Brent Hurd went to a nearby Denny's restaurant. The Denny's was crowded, but the group of friends quickly found a place to sit, and they were soon joined by their friend, Ronnell Spencer, and several other people.

---

[1] Simultaneously with filing his opening brief Reynolds filed a motion to augment the record in this appeal with the transcript of witness Brent Hurd's testimony in the earlier trial of codefendant Stanley Simon. We treated the motion as a request for judicial notice and granted that request as to the transcript. On our own motion we now take judicial notice of the entire appellate record in *People v. Simon* (G045927).

2

After a time, Boyd and Washington went to the restroom. While they were inside the restroom, seven or eight African-Americans, including Reynolds, Yolanda Brown, Stanley Simon, Nicholas Valerio, and Jarrell Kelly, came into the restroom. At least two members of this group had guns. One gun was pointed at Boyd and another at Washington. Various members of this group demanded Boyd and Washington turn over their jewelry, cell phones, and expensive shoes. One of them yelled out, "This is 20's."

Washington and Boyd did not resist, and various individuals patted them down and removed their possessions. Brown walked out of the restroom, but quickly returned. She said another person wearing gold chains was coming. Jones entered the restroom and saw Washington against the wall with his hands up. Jones asked what was going on. Simon demanded Jones turn over his gold necklace and grabbed it. The chain snapped, Jones hit Simon, and a melee ensued. Everyone ran out of the bathroom. Reynolds pushed Jones to the ground on his way out. Hurd came over and helped Jones to his feet, and together they chased the robbers out of the Denny's. Another Denny's patron heard someone say, "'20's" or '"this is 20's'" while the group ran through the restaurant. Witnesses also heard Jones yelling that he had been robbed.

Spencer, who was still sitting at the table, said, "Ya'll robbed my homeboys," drew a gun, ran outside, and fired several shots into the air. A return volley of gunshots came from various locations as the robbers fled for cover. Two .38- or .357- caliber bullets hit Jones in the chest and he died within minutes. An eyewitness saw Reynolds fire a gun in Jones's direction, and Jones crumble to the ground.

DISCUSSION

Reynolds raises two issues on appeal: First, he challenges Hurd's in-court identification of him as the person who pushed Jones down outside the Denny's bathroom, suggesting that without Hurd's identification no other evidence, except the

3

testimony of his accomplice, Damon Hill, tied him to the robberies. Second, he joins in the argument raised by Brown in her separate appeal that Spencer's intervention gave rise to a sua sponte obligation to instruct the jury on causation. (CALCRIM 240.) We address each issue in turn and find neither has merit.

*1. In-Court Identification*

*a. Pretrial Proceedings*

Reynolds made a pretrial motion to prohibit any in-court identification by Hurd based upon certain events which had occurred during the earlier trial of codefendant Simon. Before the Simon trial, the prosecution prepared a document entitled, "People v. Kelly, Brown, Hill, Reynolds, Valerio, Simon" which contained the names and photographs of the six defendants. This document was marked as People's Exhibit No. 23 for the Simon trial.

During the Simon trial the prosecutor showed Exhibit No. 23 to an eyewitness without objection, but that eyewitness was unable to identify anyone. Later in the Simon trial, during cross-examination of Hurd, Simon's attorney asked Hurd if he had seen "everybody" who came out of the Denny's restroom. Hurd said he saw people run by him at close range, and he claimed to have gotten a good look at some of these people.

Simon's attorney then showed Hurd Exhibit No. 23and asked him "if [he] recognize[d] anybody." Hurd pointed to Kelly, Hill, Brown, and Reynolds, and said they had been involved in the robbery, or at least had run by him on their way out of the restroom. Hurd testified Reynolds was the one who pushed Jones down. Hurd was unable to identify Simon or Valerio. Hurd also testified in the Simon trial that during the initial investigation Anaheim Police officers had shown him several other photographs, but he was only able to identify Kelly because he knew him from high school.

4

### b. Trial Court Ruling

The trial court denied Reynolds's pre-trial motion to exclude any in-court identification by Hurd during the Reynolds trial. The trial court found Exhibit No. 23 was not "'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification,'" citing *Simmons v. United States* (1968) 390 U.S. 377 and *Manson v. Brathwaite* (1977) 432 U.S. 98. As the trial court stated, "This isn't a perfect photo lineup. But as I said earlier, except for the names in various locations on what is now court exhibit 1 and was previously People's 23 in Mr. Simon's trial, I frankly don't find the photo lineup itself impermissibly suggestive. I've seen a lot worse, which is not the standard. I've seen better; I've seen worse. I don't think this is that bad. If this was shown without names to any prospective witness in this case, I don't think as a matter of law any court would find that it was impermissibly suggestive."

The trial court also concluded there was no state action in Hurd's identification of Reynolds during the Simon trial and referenced several factors used by a jury to evaluate eyewitness identification testimony. In the end, the trial court found Reynolds's objection to Hurd's in-court identification of Reynolds went to the weight of the evidence and not its admissibility.

### c. In-Court Identification

Later, during the Reynolds trial, Hurd testified he saw five African-American males and one African-American female come out of the Denny's restroom. He said Jones backed up as the others rushed out. Nevertheless, Hurd testified Jones was pushed down right in front of him, and he pointed to Reynolds at the defense table when asked if he saw the person who pushed Jones down anywhere in the courtroom.

On cross-examination by defense counsel during the Reynolds trial, Hurd said his friends found a photograph of Kelly and sent it to his MySpace page, but he denied searching MySpace for photographs of other suspects. On redirect, the prosecutor

5

asked Hurd if he had identified Reynolds from a photograph during his testimony in the Simon trial. Hurd said he did pick Reynolds's picture, and admitted the first time he had seen that picture (Exhibit No. 23) was at the Simon trial.

Hurd also claimed he previously identified Reynolds in a true six-pack photograph lineup a detective had shown him. However, a detective testified he had not shown Hurd a six-pack lineup that included Reynolds's picture. In fact, this detective testified Hurd identified Kelly from a six-pack lineup and said he knew him from his old neighborhood, but that Kelly was the only person he could identify.

### d. Analysis

Reynolds challenges the trial court's ruling on his motion to exclude Hurd's in-court identification of him, claiming the court violated his state and federal Constitutional right to due process of law. We disagree.

"In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) An appellate court conducts an independent review of the trial court's determination ruling. (*People v. Kennedy* (2005) 36 Cal.4th 595, 609, disapproved on another point in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

This case does not present the typical scenario for suggestive six-pack photographic identification procedures. While Exhibit No. 23 did contain six

6

photographs, it was not used to identify potential suspects during the investigation of the crimes. In fact, there is no evidence any police officer ever used Exhibit No. 23. To the contrary, the prosecutor used Exhibit No. 23 while questioning another witness during the Simon trial. Simon's defense attorney then showed it to Hurd in a gamble that paid off: Hurd was unable to indentify Simon. Even so, the first time Hurd saw the photograph of Reynolds, he said Reynolds was the person who pushed Jones to the ground when the restroom cleared. Then, in the Reynolds trial the prosecutor simply asked Hurd if he saw the person who pushed Jones down in the courtroom, and Hurd pointed to Reynolds.

Reynolds fails to explain how Hurd's in-court identification of him during the Simon trial was unduly suggestive. In fact, there was nothing suggestive in defense counsel's impromptu use of the People's exhibit during the Simon trial. Counsel merely showed Hurd the photographs and asked if he recognized anyone. Not only did Hurd recognize Reynolds, he testified Reynolds was the person who pushed Jones to the ground inside the Denny's restaurant.

Furthermore, Reynolds fails to explain how Hurd's in-court identification of him during the Simon trial was unreliable. If anything, that identification seems more reliable because it did not involve investigating officers or the prosecutor, and there is no evidence Hurd even knew the names of any of Kelly's codefendants at that time. In addition, Hurd had the opportunity to see Reynolds up close. True, the circumstances were chaotic, but Hurd's testimony suggests he was paying careful attention to the people running by him. Finally, there is no evidence Hurd previously gave a description of Reynolds to investigators, but he consistently indentified Reynolds as the person who pushed Jones to the ground. Thus, even though the identification happened years after the crime, the fact he first identified Reynolds while under oath in the Simon trial, engenders confidence in the identification, not doubt.

Reynolds also disputes the trial court's finding there was no state action but cites no authority for his assertion the "People's preparation and use of the photo display

7

in Simon's trial made them complicit in its use during Hurd's testimony."  We are not convinced.  During the Simon trial the prosecutor did not suggest anything to Hurd which related to Reynolds and did not use Exhibit No. 23 in any impermissible way.

In sum, under the facts presented and considering the factors appropriate to our determination, Hurd's identification of Reynolds as one of the robbers in Simon's trial was not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification in Reynolds's trial.  (*Simmons*, *supra*, 390 U.S. at p. 384.)  Therefore, we agree with the trial court and find Reynolds's arguments go to the weight rather than the admissibility of Hurd's in-court identification of Reynolds.


*2.  CALCRIM No. 240*

Reynolds next argues, "Spencer's unlawful intervention [in the robbery] raises a legal issue whether it was an independent intervening cause of Jones' death that abrogates felony-murder as to appellant, who was not personally involved in the shooting."  He contends Spencer's intervention triggered the court's sua sponte duty to instruct the jury with CALCRIM No. 240.[2]  Again, we disagree.

In *People v. Cervantes* (2001) 26 Cal.4th 860 (*Cervantes*), the California Supreme Court had occasion to discuss proximate causation in the context of a

---

[2] The version of CALCRIM No. 240 in effect at the time of trial provided, "An act [or omission] causes (injury/____ *<insert other description>*) if the injury/____*<insert other description>*) is the direct, natural, and probable consequence of the act [or omission] and the (injury/____ *<Insert other description>*) would not have happened without the act [or omission].  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.  [¶] *<Give if multiple potential causes.>*  [¶] [There may be more than one cause of (injury/____*<insert other description>*).  An act [or omission] causes (injury/____ *<insert other description>*), only if it is a substantial factor in causing the (injury/____*<insert other description>*).  A substantial factor is more than a trivial or remote factor.  However, it does not have to be the only factor that causes the (injury/____ *<insert other description>*).]"

8

provocative act murder prosecution. (*Id.* at p. 866.) The high court stated, "'In general, an "independent" intervening cause will absolve a defendant of criminal liability. [Citation.] However, in order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.] On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.] '[ ] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. [ ] The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' [Citation.]" [Citation.]' [Citations.]" (*Id*. at p. 871.)

In *Cervantes*, members of different gangs attended the same party. The defendant, a member of the Highland Street gang, shot a member of the Alley Boys gang (Linares) in the arm and chest during a scuffle over a perceived slight to a woman associated with the Alley Boys. (*Id.* at pp. 863-864.) A melee erupted with several participants yelling gang challenges. (*Ibid.*) A short time later, a group of Alley Boys spotted a lone Highland Street gang member (Cabrera) and fired several shots, killing him. (*Id.* at p. 864.) At trial on charges he killed Cabrera, the defendant testified he did not intend to shoot anyone, and that he was driving away from the party when he heard several shots being fired. (*Ibid.*)

The California Supreme Court reversed the defendant's conviction, observing, "Defendant was not the initial aggressor in the incident that gave rise to the provocative act. There was no direct evidence that Cabrera's unidentified murderers

9

were even present at the scene of the provocative act, i.e., in a position to actually witness defendant shoot Linares. Defendant himself was not present at the scene where Cabrera was fatally gunned down; the only evidence introduced on the point suggests he was already running away from the party or speeding off in his car when the victim was murdered." (*Cervantes*, *supra*, 26 Cal.4th at p. 872, fns. omitted.) The high court further observed, Cabrera's murderers "'intend[ed] to exploit the situation created by [defendant], but [were] not acting in concert with him,' a circumstance that is 'normally held to relieve the first actor [defendant] of criminal responsibility.' [Citations.]" (*Id.* at p. 874.)

Here, unlike *Cervantes,* Spencer took it upon himself to protect his friends during the course of a robbery, but there is no evidence he sought to exploit the situation caused by Reynolds and his fellow gang members. In our view, Spencer stands in the shoes of a victim of the robbery or a responding police officer, and should not be considered an intervening or superseding cause cutting off Reynolds's liability for Jones's death. (See *Cervantes*, *supra*, 26 Cal.4th at p. 868; see also *People v. Gilbert* (1965) 63 Cal.2d 690, 704-705 [police officer kills accomplice] reversed on grounds not relevant here *sub nom. Gilbert v. California* (1967) 388 U.S. 263.)

Under established principles of causation, "[t]he defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act. [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 847.) A shooting death during a gang-related armed robbery like this is a reasonably foreseeable risk, not an extraordinary or abnormal occurrence. By way of contrast, if an airplane had fallen from the sky and killed Jones, then Reynolds's argument would have merit. But here we see no reason for absolution simply because the victims' friend intervened as opposed to one of the victims himself or a responding peace officer.

10

The evidence shows Reynolds participated in two armed robberies in which more than one perpetrator possessed a gun. The crimes took place in a busy restaurant. Although a bystander's violent intervention was not inevitable, Spencer's involvement in the robbery is hardly the type of occurrence so remote and unusual that it would cut off the criminal liability of one of the robbery participants. "[I]t is impossible to see how it could reasonably be concluded that the death[] of [Jones] in such circumstances could have been an unnatural or improbable consequence of appellants' admitted acts." (*People v. Anderson* (1991) 233 Cal.App.3d 1646, 1662.)

Reynolds also argues Spencer's acts were not legally justifiable, and he "cannot be liable for the robbers' reaction to Spencer's independent, illegal, and lethal conduct." He has cited no authority for the proposition an intervening act cuts off liability unless the intervening act is both foreseeable *and* legally justifiable. Furthermore, we are not prepared to find on this record that his acts fall outside of Penal Code section 197's provision for justifiable homicide when the life of another is threatened, or as a justified act to apprehend those who had just robbed his friend. (See Pen. Code, § 197, subds. (1), (4).)

Finally, as Reynolds concedes, the court gave CALCRIM No. 540-B, which required the jury to find, among other things, a "logical connection" between the cause of Jones's death and the robbery, and that the connection between the robbery and murder was "more than just their occurrence at the same time and place." And, as the Attorney General notes, the trial court also gave CALCRIM Nos. 549 and 730, which informed the jury Reynolds could be convicted of felony murder only if it determined the act causing Jones's death and the robberies were part of one continuous transaction. Thus, there was no sua sponte obligation to instruct the jury with CALCRIM No. 240.

11

DISPOSITION

The judgment is affirmed.

THOMPSON, J.

WE CONCUR:

ARONSON, ACTING P. J.

IKOLA, J.