Filed 1/22/20

# CERTIFIED FOR PARTIAL PUBLICATION*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| MARILYN ZEMEK, | E072844 |
| Petitioner, | (Super.Ct.No. RIF1900604) |
| v. | OPINION |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, |  |
| Respondent; |  |
| THE PEOPLE, |  |
| Real Party in Interest. |  |

ORIGINAL PROCEEDINGS; petition for writ of mandate.  David J. Danielsen, Judge.  Petition denied.

Richard Blumenfeld for Petitioner.

No appearance for Respondent.

---

\*      Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part VI and footnotes 1 and 3.

Michael A. Hestrin, District Attorney, and Robert A. Hightower, Deputy District Attorney, for Real Party in Interest.

Pamelia Powell, aged 69, had been prescribed multiple central nervous system depressants, with additive effects. In April 2016 and again in May 2016, she had to be hospitalized for overdoses.

In between the two hospital stays, petitioner Marilyn Zemek, who was already Powell's friend, agreed to become her paid caretaker. She acknowledged at the time that Powell needed "constant companionship," including help with "properly taking her medication."

Later in May 2016, petitioner took Powell to petitioner's former attorney. He prepared new estate planning documents for Powell that left everything to petitioner.

In June 2016, petitioner left Powell home alone for at least two days and perhaps as much as four days. During that time, Powell died of an overdose of her prescription medications. After Powell's death, petitioner bought items using Powell's credit card and emptied Powell's bank accounts.

Based on this evidence, a magistrate held petitioner to answer for crimes including murder, elder abuse, and grand theft. The trial court denied petitioner's motion to set aside the information. Petitioner seeks writ review. She argues that there was (1) insufficient evidence of malice, (2) insufficient evidence that she was the legal cause of Powell's death, and (3) insufficient evidence that the money she took did not belong to her. We will reject these contentions and deny the petition.

2

I

FACTUAL BACKGROUND

The following facts are taken from the evidence admitted at the preliminary

hearing.[1]

A.    *General Background.*

Around November 2015, petitioner met Pamelia Powell  at a "[B]otox party."

Thereafter, they became friends.

Powell had heart disease.  She also suffered from seizures.  To control them, she

had been taking phenobarbital by prescription for years.

In November 2015, Powell gave her friend Dennis McDuffee a general power of

attorney and a health care power of attorney; she also signed a new will, naming him as

her executor.

---

[1]      Some 28 exhibits were admitted, but petitioner has not provided any of them to us.  This is a daring approach — particularly when arguing insufficiency of the evidence.  (See *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574 ["to prevail on a sufficiency of the evidence argument, . . . the defendant must set forth in his opening brief *all* of the material evidence . . . in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict."]; Cal. Rules of Court, rule 8.486(b)(1)(B) [petition must be accompanied by "[a]ll documents and exhibits submitted to the trial court supporting and opposing the petitioner's position."].)

The People, however, also have not provided us with any of the exhibits.  (See Cal. Rules of Court, rule 8.487(c).)  Arguably, we could treat this as a concession that the exhibits are not material.  (Cf. Cal. Rules of Court, rule 8.163.)

We need not decide the effect of our lack of the exhibits, because we have managed to resolve the appeal without them.

B.      *Powell Is Repeatedly Hospitalized.*

Throughout 2016, Powell was 69 years old.

On March 23, Powell had a seizure.  A neighbor called paramedics, and she was admitted to a hospital.  On her admission, she was "severely confused and disoriented."

On or about April 10, petitioner found Powell on the floor, unconscious due to an overdose.[2]  Powell was hospitalized again.  When admitted, she was completely nonresponsive.  During her stay, she was confused and delirious.  She needed help to bathe, get dressed, and eat.

On April 18, Powell was discharged to ManorCare, a skilled nursing facility, where she remained until May 2.  Around this time, McDuffee and petitioner agreed that petitioner would act as Powell's paid caretaker.  Petitioner acknowledged that Powell needed "constant companionship," including help with "properly taking her medication."  Petitioner was to be paid — and later was, in fact, paid — out of Powell's checking account.

After Powell was released from ManorCare, petitioner started spending days with her in her home.  On May 10, petitioner told McDuffee:  "I have been able to keep her on schedule with her medication . . . ."  She added:  "I . . . manage her meds properly . . . ."  She noted that Powell had proved "unable to stay on track" with her medications on weekends.  Finally, she noted that Powell had to wear diapers, because she was too

---

[2]      According to the deputy coroner, petitioner said that she was the one who found Powell.  However, there was also evidence that it was a family member or a neighbor.

4

unsteady to make it to the bathroom, even with assistance. On one occasion, she found Powell "in a pool of pee."

On May 16, Powell overdosed again on a combination of phenobarbital and a benzodiazepine (i.e., a tranquilizer, such as Valium). Petitioner called 911, and Powell was hospitalized a third time. During her stay, she showed signs of psychosis, visual hallucinations, and confusion. She needed "total assistance" with activities of daily living. Petitioner advised hospital personnel that "Powell had periods of confusion, incontinence, and was frequently falling."

On May 19, Powell was discharged to Desert Springs Healthcare & Wellness Center. While there, she was still confused and disoriented; her decision-making was severely impaired.

On May 27, petitioner checked Powell out of Desert Springs for a day visit. Powell had to be back by 11:00 p.m.; if she was not, she would lose her spot in the facility. As 11:00 p.m. approached, an employee of the facility phoned petitioner and threatened to call the police if she did not bring Powell back. Petitioner returned with Powell at 11:00 p.m. or a little after.

The same employee overheard petitioner trying to convince Powell to leave the facility. She considered this to be "brainwashing." She confronted petitioner and said it would be dangerous for Powell to leave without being cleared by a doctor. Petitioner claimed that she held Powell's health care power of attorney, but she could not produce a copy.

5

Powell then left with petitioner. The employee followed them out to the parking lot and insisted that Powell sign a form acknowledging that she was leaving against medical advice; Powell did so.

C.      *Powell Changes Her Estate Plan in Favor of Petitioner*.

Petitioner took Powell to see an attorney named John Gallegos, who had previously represented petitioner. Petitioner filled out an estate planning questionnaire on Powell's behalf.

Gallegos's files contained:

1. A health care power of attorney in favor of petitioner, signed by Powell on May 28.

2. A general power of attorney in favor of petitioner, signed by Powell on June 3.

3. A revocable living trust, naming petitioner as Powell's contingent trustee and sole beneficiary, signed by Powell on June 10.

4. A will, naming petitioner as Powell's executor and sole legatee, also signed by Powell on June 10.[3]

In the opinion of an expert witness, Powell did not have the capacity at the time to make such decisions.

---

[3]      Powell's personal belongings, such as vehicles and jewelry, went to petitioner via the will; aside from a $10,000 bequest, however, money did not. It seems likely — though without the exhibits (see fn. 1), we cannot say for sure — that money went to petitioner via the trust.

D. *Powell Is Found Dead.*

On June 17, at 11:30 a.m., petitioner drove into Powell's gated community. At 11:40 a.m., she called 911 and reported that Powell was dead.

Before that, according to gate records, the last time petitioner had been to Powell's house was on June 13; however, the records could have been incomplete.

When the police arrived, petitioner was crying and upset. She identified herself as Powell's friend and "caretaker."

Powell was lying on her back in a recliner. Next to her, there was a bowl of orange Jell-O, but no spoon. There was a white powder around her mouth, which could have been pill residue. Similar white powder was in a bowl next to her. It was never tested.

There were bottles of pills next to her, as well as in the kitchen and in the bedroom, including phenobarbital, diazepam (Valium), and leviracetam (Keppra). A bottle of phenobarbital that was labeled as 270 pills actually contained 277 pills; a second bottle of phenobarbital contained 107 pills.

The cause of death was "multiple drug intoxication." The drugs in Powell's system included two antiseizure medications (phenobarbital and levetiracetam [Keppra]), two antidepressants (venlafaxine [Effexor] and citalopram [Celexa]) and two antianxiety medications (lorazepam [Ativan] and diazepam [Valium]). The level of phenobarbital was in the "lethal range" — more than double the upper limit of the therapeutic range. The level of venlafaxine was also above the therapeutic range.

The deputy coroner estimated the time of death at between 1:30 to 5:30 a.m. on June 17. She could not determine whether the manner of death was accident, suicide, or homicide.

Petitioner told police the last time she saw Powell alive was on June 15. Powell had told her to take a couple of days off. On June 16, she tried to call Powell several times, but there was no answer. She tried again on June 17; when there was still no answer, she went to Powell's home to check on her.[4]

Petitioner also told police that Powell had a history of depression. She added "that Powell's health was declining, and she was not able to care for herself in the days prior to her death."

Petitioner denied ever giving Powell medication; she said that a company called Visiting Angels came to the house and managed Powell's medications. The police contacted Visiting Angels, which denied that Powell was ever its client or that it ever managed medication for anyone.

E. *Petitioner Takes Possession of Powell's Money*.

On August 8, petitioner purchased a pair of sunglasses while shoplifting two more pairs. She paid with her own credit card, but she signed Powell's name.

---

[4] Neighbors told the police that petitioner had arrived at Powell's home at 10:00 a.m. on June 17. From this, at least according to petitioner, the prosecution concluded that she force-fed an overdose of pills to Powell. It abandoned this theory only when the gate records showed that she arrived at Powell's home on June 17 at 11:30 a.m., just before she called 911. In addition, Powell died hours before 10:00 a.m., and the autopsy showed no signs of force-feeding.

8

After the store reported the shoplifting, a police officer interviewed petitioner. She said that she signed Powell's name because she mistakenly thought she was using Powell's credit card. She claimed she had a right to do so, because she was Powell's "legal caretaker."

In October and November, a total of $7,894.34 was charged to Powell's credit card. Security videos showed petitioner making two of these charges.

On June 2, 2017, petitioner withdrew all of the money from Powell's bank accounts — a total of $201,634.

F. *Perjury*.

In a declaration that was filed in Powell's probate case, petitioner denied taking Powell from a hospital against medical advice. She added that Powell phoned her and asked her to pick her up. She also denied taking Powell to see Attorney Gallegos. She stated, "My recollection is that Mr. Gallegos had not been my attorney since 2007." Actually Gallegos had represented her in two court cases in 2013 and 2014.

II

PROCEDURAL BACKGROUND

The People filed a complaint charging petitioner with:

Count 1: Murder (§ 187, subd. (a)),[5] with a financial gain special circumstance (§ 190.2, subd. (a)(1)).

---

[5] This and all further statutory citations, unless otherwise indicated, are to the Penal Code.

9

Count 2: Elder abuse (§ 368), with an enhancement for causing the death of the victim (*id*., subd. (b)(3)(A)).

Count 3: Grand theft (§ 487, subd. (a)), allegedly committed on or about June 2, 2017 (i.e., withdrawing money from Powell's bank accounts).

Count 4: Identity theft. (§ 530.5, subd. (a).)

Count 5: Grand theft (§ 487, subd (a)), allegedly committed between September 1 and November 15, 2016 (i.e., using Powell's credit card).

Count 6: Perjury in an affidavit. (§ 118a.)

The complaint also alleged an enhancement for a taking of more than $100,000. (§ 186.11, subd. (a)(1).)

As is not only permitted (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 473-474) but also customary, the complaint did not allege the degree of the murder.

At the end of the preliminary hearing, the magistrate found implied malice but no express malice: "I find that this act was not with expressed malice because I don't think there was an intent to kill anybody but did act with implied malice because it's the act or omissions of not looking after Ms. Powell appropriately and actual probable consequences of the actual dangers to human life and based on the prior history of overdosing on drugs at least twice . . . Ms. Zemek knew, based on her closeness to the deceased, knew that this was dangerous. That overdosing was a possibility. And she deliberately acted with conscious disregard to a human life." He also found that the

10

financial gain special circumstance (which would require that the murder be intentional) did not apply. Otherwise, he held petitioner to answer.

The People filed an information containing the same counts and allegations as the complaint, minus the financial gain special circumstance. Once again, the information did not allege the degree of the murder.

Petitioner filed a motion to set aside the information (§ 995) as to counts 1 (murder), 2 (elder abuse), and 3 and 5 (grand theft). She argued that there was insufficient evidence of malice or causation. She also argued that, when the alleged thefts occurred, Powell was already dead. After hearing argument, the trial court amended the information so as to name Powell's estate as the victim of the grand theft counts. Otherwise, it denied the motion. It set the case for trial.

After petitioner filed the present petition for a writ of mandate and/or prohibition, we issued an order to show cause and stayed the proceedings in the trial court.

III

STANDARD OF REVIEW

"To prevail on a section 995 motion to set aside an information, the defendant must establish that he was 'committed without reasonable or probable cause.' [Citation.] To establish probable cause sufficient to withstand a section 995 motion to dismiss, the People must make some showing as to the existence of each element of the charged offense. [Citation.] 'Evidence that will justify a prosecution need not be sufficient to support a conviction. [Citations.] "'Probable cause is shown if a man of ordinary caution

11

or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused.'" [Citations.] An information will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it. [Citations.]' [Citation.] '[T]he showing required at a preliminary hearing is exceedingly low.' [Citation.] An information should be set aside 'only when there is a total absence of evidence to support a necessary element of the offense charged.' [Citation.]" (*People v. Chapple* (2006) 138 Cal.App.4th 540, 545-546.) "'[E]vidence which will justify prosecution under the above test need not be sufficient to support a conviction.' [Citation.]" (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 7.)

"When we review a section 995 motion, we 'disregard [] the ruling of the superior court and directly review[] the determination of the magistrate.' [Citations.] . . . We will not set aside an information 'if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.' [Citation.]" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 654.)

IV

THE SUFFICIENCY OF THE EVIDENCE OF MALICE

Petitioner contends that the magistrate's findings conclusively establish that there was no express malice, and there was insufficient evidence of implied malice.

12

A.    *The Effect of the Magistrate's Findings.*

"[I]n proceedings under section 995 it is the magistrate who is the finder of fact . . . . [Citation.]" (*People v. Laiwa* (1983) 34 Cal.3d 711, 718.)  "The magistrate's role is limited by statute to determining whether or not there is sufficient cause to believe the defendant guilty of a public offense.  [Citation.]  Within the framework of his limited role, however, the magistrate may weigh the evidence, resolve conflicts, and give or withhold credence to particular witnesses.  [Citations.]" (*Johnson v. Superior Court* (1975) 15 Cal.3d 248, 252.)

"We conduct an independent review of the evidence, but will not substitute our judgment for that of the magistrate as to the credibility or weight of the evidence.  [Citation.]" (*People v. San Nicolas*, *supra*, 34 Cal.4th at p. 654.)

By contrast, "the prosecution may challenge the magistrate's legal conclusion that the evidence was insufficient to show that the charged offense occurred.  [Citations.]" (*People v. Leon* (2015) 61 Cal.4th 569, 596.)  "A mere refusal to hold to answer does not amount to a factual determination fatal to the charge. . . .  To accept the [contrary] position would be to destroy the distinction and impose factual findings in every case in which a holding order was denied the People." (*People v. Superior Court* (*Day*) (1985) 174 Cal.App.3d 1008, 1017.)

"In the context of dismissal of charges at a preliminary hearing, a court makes a factual finding when, after resolving evidentiary disputes and/or assessing witnesses' credibility, it determines there is no evidentiary support for one or more elements of a

13

charge. Conversely, a court makes a legal conclusion when it accepts the prosecution's evidence, but determines there is insufficient evidentiary support for one or more elements of a charge. [Citations.]" (*People v. Rowe* (2014) 225 Cal.App.4th 310, 318.)

The magistrate has a "limited role in making credibility determinations." (*People v. Bautista* (2014) 223 Cal.App.4th 1096, 1102.) "Any credibility determination to be made at the probable cause stage . . . is a gross and unrefined one. The [magistrate] should not find an absence of probable cause simply because [he or she] finds the defense witnesses slightly more persuasive than the prosecution witnesses. Rather, to reject the prosecution evidence at the probable cause stage, either the evidence presented must be inherently implausible, the witnesses must be conclusively impeached, or the demeanor of the witnesses must be so poor that no reasonable person would find them credible. Thus, if the prosecution presents evidence a reasonable person could accept over that presented by the defense, probable cause should be found. The [magistrate] may not substitute [his or her] own personal belief as to the ultimate determination to be made at trial for that of a reasonable person evaluating the evidence. [Citation.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 257-258.)[6]

---

[6] In *Cooley*, the Supreme Court was reviewing a determination of probable cause by a superior court in a sexually violent predator (SVP) case. (*Cooley v. Superior Court, supra*, 29 Cal.4th at p. 235.) However, it held "that the standard of review for preliminary hearings in criminal cases should also apply to review of probable cause determinations in SVP cases." (*Id.* at p. 257.) Accordingly, in this quotation, we have substituted "magistrate" for "superior court."

It follows that, if the prosecution witnesses' testimony "was not inherently improbable, [they were] not significantly impeached, and the [magistrate] made no findings as to [their] demeanor," we must conclude that the magistrate's remarks are legal conclusions that we review independently. (*People v. Bautista*, *supra*, 223 Cal.App.4th at p. 1102.)

For example, in *Dudley v. Superior Court* (1974) 36 Cal.App.3d 977, "the magistrate expressed his opinion that no malice had been shown . . . ." (*Id*. at p. 978.) The appellate court held that this was a legal conclusion rather than a factual finding. (*Id*. at p. 985.) It explained: "[I]n a case . . . where the prosecution is supported only by testimony which the magistrate finds unworthy of belief, there is no sufficient cause to hold the accused for trial. But when the magistrate is confronted with a case where the credible evidence would support a finding of guilty, then, although the magistrate's personal opinion leads him to draw a different inference, there is nevertheless probable cause." (*Id*. at p. 983.)

"In the case at bench, there is no showing that the magistrate disbelieved the testimony describing the homicidal assault which is the basis of the prosecution's case. The unimpeached, credible evidence received at the preliminary examination supports an inference of malice and gives probable cause to try petitioner for murder, but the magistrate acted upon his personal opinion that the offense was no more than manslaughter." (*Dudley v. Superior Court*, *supra*, 36 Cal.App.3d at p. 985.)

Similarly, in *Pizano v. Superior Court* (1978) 21 Cal.3d 128, the magistrate refused to hold the defendants to answer for murder; he stated "that implied malice had not been shown . . . ." (*Id.* at p. 133.) The Supreme Court held that this was a legal conclusion: "A clear example of [a factual finding] would be when the magistrate expresses disbelief of a witness whose testimony is essential to the establishment of some element of the corpus delicti. When, however, the magistrate either expressly or impliedly accepts the evidence and simply reaches the ultimate *legal conclusion* that it does not provide probable cause to believe the offense was committed, such conclusion is open to challenge . . . .

"In this case the magistrate's explanation of his refusal to hold [the defendants] for murder clearly reveals that his determination that implied malice was not shown was a legal conclusion, not a finding of fact . . . ." (*Pizano v. Superior Court*, *supra*, 21 Cal.3d at pp. 133-134.)

Contrariwise, in *Jones v. Superior Court* (1971) 4 Cal.3d 660, the victim of the alleged sexual assault was impeached significantly. (*Id.* at p. 663.) The Supreme Court held that the magistrate's conclusion that she actually consented (*id.* at pp. 663-664) was a factual finding. (*Id.* at pp. 666-667.)

Here, the magistrate did not make any express credibility findings. Moreover, there was little evidence that the prosecution witnesses were not credible. Their

testimony was not inherently implausible; they were not significantly impeached.[7]  We conclude that — in the words of *Pizano* — the magistrate "expressly or impliedly accept[ed] the evidence and simply reache[d] the ultimate legal conclusion" that it did not show express malice.

Accordingly, we can uphold the trial court's denial of the section 995 motion if the evidence shows *either* express malice *or* implied malice.

B.      *The Evidence of Malice*.

"A conviction for murder requires the commission of an act that causes death, done with the mental state of malice aforethought (malice).  [Citation.]  Malice may be either express or implied.  [Citation.]  Express malice is an intent to kill.  [Citation.]  Implied malice does not require an intent to kill.  Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses.  [Citation.]"  (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)

---

[7]      Both the responding police officer and the deputy coroner testified that petitioner described herself as Powell's "caretaker."  The officer's testimony on this point was impeached somewhat by footage from his body-worn camera, in which petitioner did not use this word.  Likewise, the deputy coroner's testimony was impeached somewhat by the fact that she did not use this word in her report.

This impeachment, however, was not significant.  When petitioner took Powell to a medical appointment, she filled out a form identifying herself as Powell's "caregiver."  She also told the police officer who investigated the shoplifting incident that she was Powell's "legal caretaker."

"Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime. [Citations.]" (*People v. Canizales* (2019) 7 Cal.5th 591, 602.)

The evidence supported the following scenario. Petitioner knew that Powell had been hospitalized for overdoses in April and again in May. By the time the May 16 overdose occurred, petitioner had become Powell's paid caregiver. Just six days earlier, she had assured McDuffee that she was managing Powell's medications.

On May 27, Powell was confused and unable to make decisions; petitioner removed her from Desert Springs against medical advice, even though the staff warned petitioner about "the dangers of [Powell] leaving without being cleared by a doctor." Just one day later, on May 28 — inferably at petitioner's urging — Powell signed the first document revising her estate plan in favor of petitioner. This process culminated on June 10, when Powell named petitioner as her executor, successor trustee, sole legatee, and sole beneficiary. From that point on, petitioner had a motive to murder Powell.

Powell needed assistance with eating, bathing, and getting dressed. Petitioner knew she needed "constant companionship." Petitioner knew she was at risk for falling. Petitioner knew that, at least sometimes, she was incontinent and had to wear diapers. Petitioner herself told police "that Powell's health was declining, and she was not able to care for herself in the days prior to her death."

And petitioner knew that, without help, Powell was "unable to stay on track" with her medications. Despite Powell's history of overdoses, she had more than one

18

prescription's worth of phenobarbital; she had ready access to them, along with her other medications. Finally, even assuming Powell's death was a suicide rather than an accident, petitioner knew Powell had a history of depression.

This was the state of affairs when petitioner left Powell home alone for at least two days. Indeed, there is evidence that she left Powell home alone for as much as four days. She told police it was only two days, but inferably, this was false and, indeed, it showed consciousness of guilt. She came back only after she phoned Powell several times on June 16 and once on June 17 and Powell never answered — in other words, once she had reason to think that Powell was not merely unconscious but dead.

This evidence gives rise to a strong suspicion that petitioner intended to kill Powell by leaving her alone under circumstances that were likely to result in a fatal overdose.[8]

Separately and alternatively, the same evidence also gives rise to a strong suspicion of implied malice — i.e., that petitioner was subjectively aware that a fatal overdose was the natural and probable consequence of leaving Powell alone for two or four days, and that she acted with conscious disregard of this danger.

---

[8]     Petitioner also contends that the magistrate's finding that there was insufficient evidence of express malice precludes the People from "proceed[ing] on a first-degree murder theory at trial." We question whether we can reach this issue in connection with a section 995 motion, when the information merely alleges murder without specifying the degree. Assuming we can, however, because we conclude that the magistrate's finding is not conclusive and there was sufficient evidence of express malice, we further conclude that the People still have the option of prosecuting petitioner for first degree murder.

Petitioner argues that motive is irrelevant to implied malice. We disagree. If petitioner had no motive to kill Powell, her leaving Powell alone might look like mere carelessness; however, because she did have a motive to kill Powell, it inferably was done with conscious disregard.

Petitioner also marshals a number of facts that point toward her innocence. Some of these were shown only by petitioner's own statements to the police, made after the fact. For example, she claimed that Powell told her to take a couple of days off to spend some time with her husband. All of these statements may be rejected as self-serving.

None of the facts that petitioner cites defeat a strong suspicion of her guilt. For example, petitioner cites the evidence that, when Powell signed herself out of Desert Springs, she told the staff, "I don't feel comfortable showering here."[9] Nevertheless, it is inferable that petitioner talked Powell into feeling uncomfortable as part of her campaign to talk her into actually leaving; or alternatively, that petitioner leveraged Powell's discomfort to get her to sign herself out.

Similarly, petitioner points to the deputy coroner's admission that she had not been able to determine whether the manner of death was accident, suicide, or homicide. The deputy coroner, however, did not necessarily have access to all of the evidence that was before the magistrate. In any event, she simply was unable to form an opinion, to a

---

[9]    Petitioner elaborated on this, telling the police that Powell wanted to leave because she "hadn't had a shower," "[t]hey were feeding her slop," "[the p]lace was filthy," "she [h]adn't had a fresh gown," and "[s]he fell trying to open the window" and "hit her head on an iron bed." Once again, however, we may disregard petitioner's own statements.

20

reasonable medical certainty, on the manner of death; a person of ordinary caution and prudence can still conscientiously entertain a strong suspicion of petitioner's guilt.

Finally, petitioner suggests that a person can be found guilty of murder based on a failure to act only if there is "a special relationship" between the person and the victim, which (in petitioner's view) was lacking here. We agree that this is the law, but we conclude that there was sufficient evidence of the necessary special relationship.

"Murder and manslaughter are defined so as to require the 'killing' of another person . . . . Nothing in the definition of murder or manslaughter . . . affirmatively suggests that the crime may or may not be committed by omission to act. But these crimes may, in appropriate circumstances, be thus committed. So a parent who fails to call a doctor to attend his sick child may be guilty of criminal homicide if the child should die for want of medical care, though the parent does nothing of an affirmative nature to cause the child's death." (1 LaFave, Substantive Criminal Law (3d ed. 2018) § 6.2, (LaFave).) "One is not guilty of murder for intentionally killing by failure to act, however, unless the circumstances are such that there is a duty to act." (LaFave, *supra*, § 14.2(c).)

California cases on the issue — though sparse — are in accord. The leading case is *People v. Burden* (1977) 72 Cal.App.3d 603. There, the defendant's five-month-old child died of malnutrition and dehydration. (*Id*. at pp. 607-608.) The defendant admitted knowing that his wife (who was developmentally disabled) was not feeding the child adequately; he also admitted that he did not feed the child. (*Id*. at pp. 609-610.) The jury

21

was instructed "'that the word 'act' as used in these instructions includes an omission or failure to act in those situations where a person is under a legal duty to act,' and that 'the parent of a minor child has a duty to furnish necessary clothing, food, shelter and medical attention for his minor child.'" (*Id*. at p. 614.) The jury found the defendant guilty of second degree murder. (*Id*. at p. 606.)

The appellate court held: "These instructions correctly stated the law. The omission of a duty is in law the equivalent of an act and when death results, the standard for determination of the degree of homicide is identical." (*People v. Burden*, *supra*, 72 Cal.App.3d at p. 616.)

In *People v. Heitzman* (1994) 9 Cal.4th 189, our Supreme Court held that a person can be guilty of elder abuse under section 368 based on a failure to act (*People v. Heitzman*, *supra*, at pp. 197-199); it also held that, to prevent section 368 from being unconstitutionally vague, when guilt is based on failure to act, the statute must be judicially limited to persons with a duty to act. (*People v. Heitzman*, *supra*, at pp. 199-214.) In the course of so holding, the court cited *Burden* with approval. (*People v. Heitzman*, *supra*, at p. 198.) It added that "an individual's criminal liability" can be "based on the *failure* to act" only if he or she is "under an existing legal duty to take positive action." (*Id*. at p. 197.) The court indicated that the words "caretaker" and "custodian" sufficiently specify a person who has such a duty. (*Id*. at p. 214.)

Consistent with *Burden* and *Heitzman*, CALCRIM No. 520 states that, as an element of murder, the People must prove either:

1. "The defendant committed an act that caused the death of (another person . . . )]"; or

2. "The defendant had a legal duty to (help/care for/rescue/warn/maintain the property of/ <insert other required action[s]>) <insert description of decedent/person to whom duty is owed> and the defendant failed to perform that duty and that failure caused the death of (another person . . . )]."

Here, there was sufficient evidence that petitioner had a legal duty to care for Powell. Petitioner and McDuffee agreed that petitioner would act as Powell's paid caretaker. Petitioner repeatedly described herself as Powell's "caretaker." Petitioner acknowledged that Powell needed "constant companionship," including help with "properly taking her medication." She told McDuffee that she was managing Powell's medications and that Powell could not "stay on track" without her.

Petitioner points out that McDuffee did not pay her. However, McDuffee and petitioner agreed that she would be paid by Powell, and at that time, he held Powell's power of attorney. Thus, the contract was actually between Powell and petitioner. Moreover, Powell did, in fact, make payments to petitioner.

Petitioner also argues that she was not required to be with Powell around the clock. Even so, it was inferable that she was not supposed to leave Powell alone for days at a time. Alongside Powell's tendency to overdose herself, she was at risk of seizures,[10]

---

[10]    As Powell took phenobarbital to prevent seizures, she was in danger not only of overdose but also of underdose.

falls, and incontinence. Petitioner acknowledged that Powell needed "constant companionship" and "was not able to care for herself."

In sum, then, petitioner had a contractual duty to act as Powell's caretaker, which included a duty to prevent her from an overdose.

V

THE SUFFICIENCY OF THE EVIDENCE OF CAUSATION

Petitioner contends that there was insufficient evidence that she was the legal cause of Powell's death.

"An element of homicide is that the defendant's criminal act or omission be the proximate cause of the death. [Citation.]" (*People v. Morgan* (1985) 177 Cal.App.3d 466, 469.)

"'"[T]he law defines 'cause' in its own particular way."' [Citation.] A 'cause of [death] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the [death] and without which the [death] would not occur.' [Citation.]" (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1324.)

"In general, '[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating.' [Citation.] . . . But . . . the 'defendant may also be criminally liable for a result directly caused by his or her act, even though there is another contributing cause.' [Citations.]" (*People v. Cervantes* (2001) 26 Cal.4th 860, 866-867.)

24

"'In general, an "independent" intervening cause will absolve a defendant of criminal liability. [Citation.] However, in order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.] On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability. [Citation.] '[] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. [] The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' [Citation.]" [Citation.]' [Citations.]" (*People v. Cervantes*, *supra*, 26 Cal.4th at p. 871.)

"'[T]here is no bright line demarcating a legally sufficient proximate cause from one that is too remote. Ordinarily the question will be for the jury, though in some instances undisputed evidence may reveal a cause so remote that a court may properly decide that no rational trier of fact could find the needed nexus.' [Citation.]" (*People v. Brady*, *supra*, 129 Cal.App.4th at pp. 1325-1326.)

Here, there was probable cause to believe that petitioner's act or omission of leaving Powell alone, for a prolonged period of time, surrounded by medication, set in

25

motion a chain of events that resulted in Powell's death. Certainly Powell herself was an intervening cause. However, there was also sufficient evidence that her act of taking an overdose was readily foreseeable, given that she had done so before and had proven to be "unable to stay on track" with her medications in petitioner's absence. Indeed, the same evidence that we discussed in part III.B, *ante*, as showing that petitioner intended (or was aware of the risk of) Powell's death, is also evidence of foreseeability. While Powell's death was not a sure thing, it was "a possible consequence which might reasonably have been contemplated . . . ." (*People v. Cervantes*, *supra*, 26 Cal.4th at p. 871.)

Petitioner points out again that she was not contractually required to stay with Powell day and night; she asks, rhetorically, "Absent . . . round-the-clock attendance on the part of petitioner, how could she, or anyone else, have prevented Ms. Powell's death?" The answer is, by keeping her medication out of reach and doling out not more than one or two doses at any given time. This would have prevented Powell's death — even assuming it was suicide on Powell's part.

For these reasons, there was sufficient evidence that petitioner proximately caused Powell's death.

VI

THE SUFFICIENCY OF THE EVIDENCE OF

THE OWNERSHIP OF THE STOLEN PROPERTY

Petitioner contends that there is insufficient evidence of grand theft because (1) there was no theft from Powell, because she was already dead, and (2) there was no theft

26

from Powell's estate, because petitioner was the executor, trustee, and sole beneficiary. The People do not respond to this contention, so we must address it without their assistance.

Petitioner asserts that "[t]heft from the person . . . requires that the victim be living," citing *People v. McGrath* (1976) 62 Cal.App.3d 82. *McGrath*, however, dealt with a different issue. There, the question was whether *grand* theft from the person — i.e., a taking that would otherwise be petty theft, but that is elevated to grand theft because it is "from the person of another" (§ 487, subd. (c)) — can be committed after the victim is dead. (*People v. McGrath*, *supra*, at pp. 83-84, 86-88.) Here, if petitioner committed theft at all, it was grand theft for a different reason — because she took more than $950. (§ 487, subd. (a).)

Theft of any kind requires a taking of "the personal property of another." (§ 484, subd. (a).) However, subject to a few arcane exceptions (such as abandoned property and wild game), all property is always owned by somebody. Specifically, "[s]ubject to administration, 'title to a decedent's property passes *on the decedent's death* to the person to whom it is devised in the decedent's last will or, in the absence of such a devise, to the decedent's heirs as prescribed in the laws governing intestate succession.' [Citations.]" (*People v. Fenderson* (2010) 188 Cal.App.4th 625, 637.) Hence, ordinarily, when a dead person's property is taken, the victim is his or her estate. (*Ibid*.)

The legal principle that is controlling here is that you cannot steal property of which you are the sole owner. (*People v. Stone* (1860) 16 Cal. 369, 371-372; cf. *People*

27

*v. Llamas* (1997) 51 Cal.App.4th 1729, 1738-1739.)  In petitioner's view, by the time she started using accounts that were in Powell's name, she had become the sole true owner of those accounts — whether as executor, trustee, legatee, and/or beneficiary.

But there was evidence that petitioner was *not* the true owner.  "Any person who 'feloniously and intentionally' kills another forfeits *all* property, interests and benefits he or she otherwise would have obtained by reason of the decedent's death."  (Ross & Cohen, Cal. Practice Guide: Probate (The Rutter Group 2019) ¶ 14:525, p. 14-121; see Prob. Code, § 250.)  And a person who maliciously or recklessly commits elder abuse when the victim is "substantially unable to manage his or her financial resources or to resist fraud or undue influence" similarly forfeits all benefits under a will or trust.  (Prob. Code, § 259, subd. 4.)  As already stated in part III.B, *ante*, there was sufficient evidence that petitioner intentionally murdered Powell.  There was also sufficient evidence that, even assuming she acted with conscious disregard rather than intent to kill, she was disqualified because she committed elder abuse.

In sum, then, there was sufficient evidence that petitioner was not the true owner of Powell's erstwhile assets.  Based on that evidence, a jury could find that petitioner committed theft from Powell's true heirs and beneficiaries, whoever they may be.  The People were not required to prove who owned the property; they were only required to prove that defendant did not.

## VII

## DISPOSITION

The petition is denied.  The stay we previously ordered shall dissolve when the remittitur issues.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ_____
                                                    P. J.


We concur:

RAPHAEL_____
                    J.

MILLER_____
                    J.