Filed 10/11/22 P. v. Anderson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DIANE MARIE ANDERSON,<br><br>Defendant and Appellant. | F080207<br><br>(Super. Ct. No. CRF53011)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tuolumne County.  Kevin M. Seibert, Judge.

Nuttall & Coleman, Roger T. Nuttall and Jim Vorhies; Page Law Firm and Edgar E. Page for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Robert C. Nash, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Diane Marie Anderson ("Anderson") was convicted by a jury of several crimes arising out of a fatal car crash her husband, Danny Anderson ("Danny"), caused.  She was a passenger in, and a co-owner of, the vehicle her husband was driving.  On appeal,

she claims the trial court erroneously excluded expert witness testimony and erroneously refused a proposed pinpoint instruction. She also alleges cumulative error. We affirm.

## STATEMENT OF THE CASE

Anderson was charged in an information with being an accessory after the fact to gross vehicular manslaughter (Pen. Code,[1] §§ 32, 192, subd. (c)(1); count 1), hit and run resulting in death or serious injury to another person (Veh. Code, § 20001, subd. (b)(2); count 2), misdemeanor destruction of evidence (§ 135; count 3), and misdemeanor resisting or obstructing a peace officer (§ 148, subd. (a)(1); count 4). A jury convicted her as charged. The court suspended imposition of sentence and ordered her to serve a five-year period of probation under terms which included 10 months in jail.

## FACTS

### I. Prosecution's case

On October 21, 2016, at around 4:27 p.m., Officer Joelle McChesney of the California Highway Patrol responded to a traffic collision on La Grange Road (Highway J-59) just north of Bonds Flat Road in Tuolumne County. On arrival, Officer McChesney saw a white Lexus SUV down an embankment on its side, and a white Toyota Camry stopped, straddling the northbound shoulder and lane. Both cars were severely damaged.

Four people had been in the southbound Lexus. 16-year-old Trista Hoffman was driving, with her mother, Tina Hoffman, in the front passenger seat, her brother, Dillon Hoffman, in the backseat behind Tina, and her friend, Annie Jonson, in the backseat behind Trista. Trista and Tina were both killed, and Dillon and Annie were severely injured; Dillon broke both of his legs and Annie suffered a head injury. Tina was ejected from the vehicle and lie dead in the roadway.

_____

[1] Undesignated statutory references are to the Penal Code.

2.

Two people were in the Toyota Camry, husband and wife Reinholdt (John) and Dorothy Eisemann. Dorothy was driving with John in the passenger seat. John died from his injuries and Dorothy suffered lacerations to her arms.

La Grange Road is a two-lane rural road with one lane going north and one going south. The lanes are separated by solid double-yellow lines. The road contains hills, turns, and elevation changes.

Dillon Hoffman testified Trista was driving between 40 and 50 miles per hour. He saw a northbound white vehicle cross the double-yellow lines into their lane to pass some cars. He described the vehicle that was coming toward them in their lane as "white, sportsy and brand-new." Trista swerved to avoid a collision and lost control of the Lexus, which began rolling. Dillon said he saw his mother get ejected out of the front window during the rolling.

Dorothy Eisemann testified she was traveling northbound on J59 with John. Their route took them past the House Boat Mini Mart on La Grange Road. Around the area of the mini mart, they were behind a vehicle that was going below the speed limit. After they passed the mini mart, a white vehicle, travelling at a high rate of speed, "whooshed" by, passing her and the vehicle in front of her. She said she used the word "whoosh" to convey that the pass was made "at a high velocity." She said, "I did not hear a whoosh. I described the velocity as a whoosh." She said the passing vehicle was not a sedan like her car.

Just "fractions of seconds" before being passed by the white vehicle, Eisemann noticed a car travelling southbound. The southbound vehicle veered onto the shoulder and then went airborne and collided with her vehicle with a loud thud.

Officer McChesney contacted Anderson and her husband, Danny, at the scene. Danny said that he was a physician and that he had come upon the accident. Anderson told another officer that she and Danny were not involved in the accident, and that they

3.

had come upon the accident and stopped to help. Subsequently, both Anderson and Danny left the scene.

On October 22, 2016, CHP Officer Michael McDaniel obtained video footage from the House Boat Mini Mart, which was located a short distance south of the accident scene on La Grange Road. This video showed a van driving northbound just before the accident, followed by the Eisemanns' Toyota, then by a white SUV. Officer McDaniel determined the white SUV to be a 2014—2016 white Acura MDX. Law enforcement issued a series of press releases asking for the public's assistance in locating the white 2014—2016 Acura MDX.

CHP Officer Jason Austin reviewed the mini mart footage, and also reviewed surveillance footage from a storage facility two miles south of the mini mart. The cars were in the same order, but with a more significant gap between the Eisemanns' Toyota and the Acura. Officer Austin obtained a list from the DMV of all the Acura MDX's in Tuolumne, Merced, and Stanislaus Counties. There were 11 in Tuolumne County. Officer McChesney reviewed the DMV list and recognized Danny's name from having spoken to him at the accident. Officer McChesney arranged to interview Anderson and Danny.

Officer McChesney and Officer Shawn Snyder interviewed Anderson at her home on December 6, 2016. At the same time, Officer Austin and another investigator went to Danny's medical office and interviewed him. Anderson said she was the passenger and had seen nothing because she was playing a game on an iPad and was drifting off to sleep. Danny told her something was wrong and they needed to stop. After they left the scene, the two did not discuss how the collision occurred.

During the interview, Anderson said she had sold the Acura the previous weekend in Southern California. She also said she had seen the press releases and knew the accident was caused by a car making a pass, but she did not even consider going in to talk to CHP. Anderson's interview was recorded and played for the jury.

4.

The accident investigation was referred to the CHP Multidisciplinary Accident Investigation Team (MAIT) in February 2017. The team collected evidence at the scene, which included taking photographs and videos, and reviewed police reports. They were also able to obtain information from the airbag control module (ACM) of the Eisemanns' Toyota. The team also met with Eisemann at the scene and interviewed her there. From this evidence, the MAIT reconstructed the accident. The team created two videos, one from the northbound perspective and one from the southbound perspective, which depicted the collision as they theorized it happened.

CHP Officer Robert Shaw, a CHP MAIT-certified accident reconstruction expert, testified about the MAIT reconstruction. He testified that in his expert opinion Danny caused the accident by making a pass over the double-yellow lines and heading directly for Trista. He testified there would have been a head on collision had Trista not taken evasive action. He stated Trista's reaction to Danny's oncoming vehicle was reasonable and what most people would do. Shaw said, in reaching his opinion, he considered Dillon Hoffman's testimony as to the speed his sister was driving, which was also supported by physical evidence; the location where Eisemann said Danny began his pass and the fact she said she could see the Hoffmans' oncoming vehicle before the Eisemanns were passed; the physical evidence at the scene; the surveillance footage from the House Boat Mini Mart; and the data from the Eisemanns' ACM.

## II. Defense case

Anderson testified in her own defense. She said she and Danny were driving home from Los Angeles at the time of the collision. She stated she did not know Danny passed a couple of cars over a double-yellow line. She recalled Danny waking her up, telling her something happened, and saying they needed to turn around.

They arrived at the accident scene and she saw a mangled car and what she thought was a body, but she could not tell how the accident happened. She tried calling 911 but did not have reception. She saw a body of what she perceived to be a teenager on

5.

the ground and she checked for a pulse, as she is a nurse. She could not find a pulse and found Danny to help. Danny started chest compressions but stopped because the woman had died.

Anderson started to feel dizzy, went over to a police officer and held on to the officer's arm for support, and then went to her car. She testified she was only at the accident scene because Danny was a physician. Police asked for her name and address, but nobody asked her about the accident and she had no thought she and Danny were somehow involved. She did "not really" talk about the accident with Danny in the following days because it upset her.

She later saw an article that police were looking for a white Acura that fled the scene, and she showed it to Danny. They did not call police. She testified they had not fled the scene and she did not think they had anything to hide. She also said she did not like the Acura, which is why she got rid of it.

Danny also testified for the defense. He admitted passing a Toyota and a minivan in front of him in a single pass that took between five and 10 seconds. He thought it was safe to pass, and in doing so crossed a double-yellow line. He completed the pass and moved back into the northbound lane. At that point, the only oncoming southbound car was in the distance. He did not see any southbound cars go out of control.

Anderson was dozing when Danny passed the cars. He reached over and woke Anderson up and said something happened and they needed to go back. He returned to the scene and saw several cars and a horrible accident. He tried helping some of the injured. He testified his pass did not contribute to the accident and he did not know how it occurred.

Danny said he was at the scene for about 45 minutes and spoke to three law enforcement officers. He told them who he was and told them he had not witnessed the accident, but he did tell one of them he saw a flash of white in his rearview mirror. They asked him for his phone number, which he provided, and was prepared to give them his

license, but they said they did not need it. He asked a CHP officer who appeared to be in charge if it was okay for him to leave, and the officer said it was. He said he answered all of the police's questions at the scene, and at no point did they suggest he was involved.

He said he and Anderson never talked about whether they were involved in the accident because they were not. He learned law enforcement was looking for an Acura that had "fled" the scene, but he did not contact law enforcement because he did not "flee" the scene.

The defense also called Christina Hodge. Hodge was driving southbound near the collision. There was a light-colored car in front her, maybe an SUV, and a larger light-colored car behind her that then passed her and the car in front of her. They were going into a curve at the time of the pass. When the passing vehicle passed the vehicle in front of Hodge, the front vehicle lost control, went right, and then went left and hit a vehicle in the northbound lane. Before the vehicle behind her made its pass, she did not remember any vehicle going northbound.

She stopped and saw a woman's or small person's body on the ground, and one of the cars was down the embankment. She thought at first the person was a pedestrian. She left the accident site and went to her mother's house to call 911. During the prosecution's case in chief, a CHP dispatcher testified as to what was in the CAD log for this incident, which was admitted into evidence. A CAD log is a log that dispatch creates for an incident or for an incoming call. The dispatcher stated that Hodge said she saw the collision and was behind the vehicle that lost control. Hodge reported that a female, possibly a juvenile, was walking down the road, and that a vehicle was hit, and that this vehicle possibly hit the woman, who was in the roadway not breathing.

Hodge was later contacted by a private defense investigator and gave a recorded interview to investigators and attorneys. On the day of the collision, she had just put her dog down and told investigators she was very distracted. She testified in a prior proceeding she could not identify the location of the collision or the curve in which she

7.

claimed the vehicle passed her. But since that prior proceeding, she had met with defense counsel more than once who went over a map of the area with her, and now at Anderson's trial could identify spots on the map.

Also in the prosecution's case in chief, Officer McChesney testified she considered Hodge's statement that was related in the CAD log. McChesney said she called and left a message for Hodge to call her back, but after reading the log of the call, McChesney concluded Hodge really did not know what happened. By that point, Officer McChesney knew it was Tina Hoffman who was down in the road, not a juvenile who had been walking down the road.

Also during the prosecution's case in chief, Officer Shaw testified he listened to Hodge's recorded statement after he prepared his report, and he concluded nothing in that statement changed his opinion. He stated that if he thought Hodge had credible information to add, he would have considered it and changed his report.

The defense also called expert witness John Tyson, an engineer who does accident reconstruction. Tyson testified he was asked to consider whether Hodge's version of how the accident occurred was plausible. He said he did not see any evidence that CHP considered Hodge's version of events, and opined it was possible that the vehicle Hodge said passed her caused the collision. However, he also stated there was no evidence supporting Hodge's version of events. He also testified, based on Danny's testimony that he started his pass further south, that Danny could have had enough time to safely complete his pass before the point of impact.

## DISCUSSION

### I. Exclusion of expert testimony

The day before trial, defense counsel informed the prosecutor that the defense intended to call an expert witness, an investigator named Jeffery Hopkins, to testify about law enforcement's investigation of the case and the MAIT accident reconstruction. Hopkins was offered to testify that law enforcement's investigation of the accident was

8.

deficient because witnesses were not thoroughly interviewed, and that the MAIT's accident reconstruction was unreliable because it was based on calculations that were based on estimates.

The court held an Evidence Code section 402 hearing regarding Hopkins's possible testimony. According to defense counsel's proffer, Hopkins would have testified Eisemann's description of a "whoosh" going past her required law enforcement to follow-up with her to determine whether Eisemann was instead passed by a car going the opposite direction. Law enforcement also should have followed up with Dillon Hoffman regarding what was happening in the Hoffman vehicle before the accident, particularly because Trista was a student driver. Additionally, the MAIT investigation was not requested until four months after the accident, which was too late and thus unprofessional. Also, the MAIT took Eisemann to the crash scene seven months after the accident to have her point out locations needed for the reconstruction, but she should have been asked to point out those important locations much sooner. Also, CHP's failure to interview Christina Hodge was "far below professional standards" and violated law enforcement's "obligation to seek the truth."

Defense counsel stated that Hopkins would opine that all these deficiencies weigh on the reliability of the MAIT accident reconstruction and Shaw's conclusion that Danny caused the accident. The defense's theory in this regard was that if Danny was not liable for causing the collision, then Anderson could not be liable for the charges against her. That is to say, Anderson's liability for the charged offenses hinged on Danny's liability as the cause of the accident.

The trial court excluded Hopkins's testimony because (1) it was not a proper subject of expert testimony, and (2) because there was no good cause shown for why the

defense did not satisfy its discovery obligation to timely inform the prosecution of Hopkins's proposed testimony.[2]

We will affirm the exclusion of Hopkins's proffered testimony on the ground it was not a proper subject of expert testimony. We need not analyze whether it was error to exclude the testimony as untimely.[3]

### A. Analysis

" ' "Generally, the opinion of an expert is admissible when it is '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact....' " ' [Citations.] However, … "[e]xpert testimony will be excluded ' " 'when it would add *nothing at all* to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men [and women] of ordinary education could reach a conclusion as intelligently as the witness." ' " ' " (*People v. Brown* (2016) 245 Cal.App.4th 140, 156—157 (*Brown*); see Evid. Code, § 801, subd. (a).)

Additionally, "[s]ome topics are categorically off-limits to expert testimony. (See Evid. Code, § 801, subd. (b) [caveat to admissibility where 'expert is precluded by law from using such matter as a basis for his opinion'], § 802 [expert may state basis for opinion 'unless he is precluded by law from using such reasons or matter as a basis for his opinion'].)" (*Brown, supra,* 245 Cal.App.4th at p. 157.) For example, juries are competent to decide such things as witness credibility without expert assistance. (*People v. Wells* (2004) 118 Cal.App.4th 179, 189.)

---

[2] The trial court initially ruled the proffered testimony should also be excluded under Evidence Code section 352 because it would require an undue consumption of time. However, the court later stated it was not relying on Evidence Code section 352 as a ground for excluding the testimony. We therefore need not address this ground.

[3] Anderson does not dispute that her defense team failed to comply with its reciprocal discovery obligations. Thus, the only question would be whether excluding the testimony was an appropriate sanction for the discovery violation.

Here, Hopkins was offered to explain that the accident investigation was deficient. In this regard, Hopkins would have critiqued law enforcement officers' handling of the investigation, including their interviewing of witnesses, their decision to not interview Hodge, and the MAIT investigators' use of estimations in reconstructing the collision. Hopkins would have ultimately opined that these deficiencies raised a serious question about the reliability of the MAIT team's reconstruction and of Officer Shaw's opinion that Danny caused the accident. We agree with the court's ruling that Hopkins's proffered testimony was not a proper subject of expert testimony, as nothing in the proffered testimony was beyond the jury's common experience.

*People v. Johnson* (1993) 19 Cal.App.4th 778 (*Johnson*), is instructive. There, the appellate court found no abuse of discretion in excluding two expert witnesses, one of whom was a professor with a Ph.D. in sociology, on the unreliability or lack of credibility of statements or testimony of prison inmates. (*Id*. at p. 786.) The court explained "there was no need for a sociological lecture on the nature of the prison environment—the jury learned plenty about that subject from the other evidence …," and "the prospective abandonment of common sense by lay jurors for reliance on paid 'expert' testimony covering a subject well within a jury's ken …." (*Id*. at p. 791.)

Similarly, in *People v. McDowell* (2012) 54 Cal.4th 395 (*McDowell*), the California Supreme Court held that expert testimony was not required to explain how the defendant's childhood could have affected him as an adult. (*Id*. at pp. 427—428.) There, "[t]he essence of [the] proposed testimony was that defendant's childhood could have affected defendant's behavior as an adult, not how defendant's specific childhood experiences influenced the crimes he committed as an adult." (*Id*. at p. 427.) The Court found the testimony "was neither technical nor complex, and the trial court could reasonably have found that it would not assist the trier of fact because it addressed a matter readily understood by lay jurors." (*Ibid*.)

11.

Here, as in *Johnson* and *McDowell*, Hopkins's proffered testimony covered topics commonly understood by jurors. The essence of his testimony was that criminal investigations should be thorough, which includes that all potential witnesses be interviewed as soon as possible, and that the reliability of an accident reconstruction depends on the reliability of the data used to create the reconstruction. This proposed testimony was neither technical nor complex, and it pertained to matters readily understood by lay jurors. (*McDowell, supra,* 54 Cal.4th at p. 427.) There was no need for expert testimony that law enforcement should conduct thorough investigations and that accident reconstructions are only as reliable as the data used to create them, as the jurors could rely on their common sense to evaluate the alleged deficiencies in the investigation and evaluate the reliability of the MAIT's accident reconstruction. We therefore conclude the court did not abuse its discretion in excluding the proffered expert testimony.

## II.    Pinpoint instruction

First, Anderson contends the trial court erred by refusing to give her proposed pinpoint instruction on independent intervening causation. We disagree. Pinpoint instructions are appropriate only if they are in accordance with defendant's theory of the case. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 873—874.) One of the theories Anderson argued to the jury was that there was reasonable doubt that Danny caused the fatal accident, and if the jury had reasonable doubt about his liability, by extension they would have to find her not guilty on all charges. Under that theory, Danny passed safely, and someone else driving the other direction caused the accident. That theory involves not an independent intervening cause, but an altogether different cause, and therefore the proposed pinpoint instruction was not warranted because it was not at all related to the defense theory. There was no error.

### A.    Background

The court instructed the jury on causation:

"An act or omission caused injury if the injury is the direct, natural, and probable consequence of the act or omission and the injury would not have happened without the act or omission.

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.

"There may be more than one cause of the injury. An act or omission causes injury only if it is a substantial factor in causing the injury. A substantial factor is more than a trivial or remote factor. However, it does not have to be the only factor of the cause of the injury."[4]

Anderson requested that the jury be given an instruction on independent intervening causation. The defense proposed a written instruction, which it labeled "CACI 432," "Affirmative Defense-Causation: Third-Party Conduct as Superseding Cause." The proposed instruction read:

"Defendant, Diane Anderson, believes that her husband, Danny Anderson, was not the cause of the accident, and that therefore, he was not responsible for the collision and the resultant harm. Based upon the evidence introduced during the trial of the instant case, you may consider the following on the issue of whether or not the prosecution has proved beyond a reasonable doubt that the actions of Danny Anderson caused the accident:

"1. That there existed the conduct of a third party which occurred separate from the conduct of Danny Anderson;

"2. That a reasonable person would consider the third party's conduct a highly unusual or extraordinary response to the situation;

"3. That Danny Anderson did not know and had no reason to expect that the third party would act in a negligent manner; and

---

[4] Written jury instructions are not part of the appellate record. However, we observe that the court's instruction on causation matches CALCRIM No. 240, which is entitled "Causation," with the exception of the last sentence. The last sentence of CALCRIM No. 240 reads, "However, it does not have to be the only factor *that causes the injury*." (Italics added.) We agree with the People's supposition that this inconsequential difference was likely an error in speaking or transcription.

13.

"4. That the kind of harm resulting from the third party's conduct was different from the kind of harm that could have reasonably been expected from Danny Anderson's conduct."

We observe, in passing, the defense's proposed instruction deviates from CACI No. 432's language in at least one significant respect. For example, paragraph 1. of CACI No. 432 reads, "That [name of third party]'s conduct occurred after the conduct of [name of defendant][.]"

The trial court heard oral argument from the parties on the issue. Defense counsel argued that the concept of third-party liability goes to the issue of Danny's responsibility, and also to whether Anderson's belief that Danny did not cause the accident was reasonable. The trial court rejected the proposed pinpoint instruction for being untimely submitted and for being unnecessary and inappropriate. The court determined that the defense could argue their other-party causation theory under CALCRIM No. 240, and that CACI No. 432 was meant to be used "in a completely different context and purpose" than what was present here.

### B. Applicable law

#### 1. Law on pinpoint instructions

" 'Upon proper request, a defendant has a right to an instruction pinpointing the theory of defense ... if the theory proffered by the defendant is supported by substantial evidence' [citation], the instruction is a correct statement of law [citation], and the proposed instruction does not simply highlight specific evidence the defendant wishes the jury to consider [citation]." (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1174.) A defendant is not entitled to a specific pinpoint instruction if it does not relate to particular facts or a theory of the defense. (See *People v. Reed* (2018) 4 Cal.5th 989, 1009.)

The trial court " 'may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence.' " (*People v. Bivert* (2011)

14.

52 Cal.4th 96, 120.) "[W]here standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 857.) "There is no error in a trial court's failing or refusing to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 277.)

"We review claims of instructional error de novo." (*People v. Lyon* (2021) 61 Cal.App.5th 237, 253.) "We look to the instructions as a whole and the entire record of trial, including arguments of counsel. [Citation.] Where reasonably possible, we interpret the instructions ' "to support the judgment rather than [to] defeat it." ' " (*People v. Mason* (2013) 218 Cal.App.4th 818, 825.)

### 2.    *Law on causation in criminal cases*

We next set forth the principles of causation in criminal cases. "The principles of causation apply to crimes as well as torts. [Citation.] 'Just as in tort law, the defendant's act must be the legally responsible cause ("*proximate cause*") of the injury, death or other harm which constitutes the crime.' [Citations.] Thus, in the language of the standard jury instruction, to constitute a homicide '… there must be, in addition to the death of a human being, an unlawful act which was a cause of that death.' [Citation.] [¶] But the law, the Supreme Court has noted, ' "defines 'cause' in its own particular way." ' " (*People v. Schmies* (1996) 44 Cal.App.4th 38, 46—47 (*Schmies*); *People v. Brady* (2005) 129 Cal.App.4th 1314, 1324 (*Brady*).)

"In homicide cases, a 'cause of death of [the decedent] is an act or omission that sets in motion a chain of events that produces a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.' [Citation.] In general, '[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating.' "

(*People v. Cervantes* (2001) 26 Cal.4th 860, 866 (*Cervantes*); *Brady, supra,* 129 Cal.App.4th at p. 1324.)

"California courts have adopted the 'substantial factor' test for analyzing proximate cause. '... Under that standard, a cause in fact is something that is a substantial factor in bringing about the injury. [Citations.] The substantial factor standard generally produces the same results as does the "but for" rule of causation which states that a defendant's conduct is a cause of the injury if the injury would not have occurred "but for" that conduct. [Citations.] The substantial factor standard, however, has been embraced as a clearer rule of causation—one which subsumes the "but for" test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact.' " (*People v. Foalima* (2015) 239 Cal.App.4th 1376, 1396.)

" ' "There may be more than one proximate cause of the death. When the conduct of two or more persons contributes concurrently as the proximate cause of the death, the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the time of the death and acted with another cause to produce the death." ' " (*People v. Sanchez* (2001) 26 Cal.4th 834, 847.) "Indeed, it has long been recognized that there may be multiple proximate causes of a homicide, even where there is only one known actual or direct cause of death." (*Id.* at p. 846.)

"[T]he 'defendant may also be criminally liable for a result directly caused by his or her act, even though there is another contributing cause.' " (*Cervantes, supra,* 26 Cal.4th at pp 866—867.) "The defendant is liable for a crime irrespective of other concurrent causes contributing to the harm [citation] .... Moreover, a superseding cause must break the chain of causation after the defendant's act before he or she is relieved of criminal liability for the resulting harm." (*People v. Wattier* (1996) 51 Cal.App.4th 948, 953.)

16.

"Intervening causes in criminal cases are typically described as either 'dependent' or 'independent.' A dependent intervening cause will not absolve a defendant of criminal liability while an independent intervening cause breaks the chain of causation and does absolve the defendant. [Citation.] 'An intervening cause may be a normal or involuntary result of the defendant's original act. Such a cause is said to be "dependent," and does not supersede; i.e., the defendant is liable just as in the direct causation case.' [Citation.] An 'independent' intervening 'act may be so disconnected and unforeseeable as to be a superseding cause; i.e., in such a case the defendant's act will be a remote, and not the proximate, cause.' [Citation.] ... '[W]here the negligent conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause.' [Citation.] Stated another way, '[t]he intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about.' " (*Schmies, supra,* 44 Cal.App.4th at p. 49, fn. omitted; *Cervantes, supra,* 26 Cal.4th at pp. 871—872.)

## C.     Analysis

The trial court properly declined to give the requested instruction on independent intervening causation because the instruction was not at all related to the defense's theory that someone else besides Danny caused the accident. Anderson theorized that Danny safely completed his (illegal) passing maneuver before some other driver's subsequent actions caused the accident. Her theory, therefore, was not one of independent intervening causation, but of an altogether different cause.

Invoking the defense of intervening causation—whether dependent or independent—in this case necessarily implies that Danny committed a wrongful act that started a chain of causation, and then some other person's subsequent action broke that chain. (*Schmies, supra,* 44 Cal.App.4th at p. 49.) But again, Anderson's theory of

someone else causing the accident is incompatible with the concept of independent intervening causation. The requested instruction was therefore not relevant to the defense's theory. There was no instructional error. In light of this conclusion, we need not address whether it was error to reject the proposed instruction as untimely submitted.

## III. Cumulative error

Anderson contends the cumulative effect of the errors here requires reversal. " 'Under the "cumulative error" doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial.' " (*People v. Loza* (2012) 207 Cal.App.4th 332, 365.) There is no error to accumulate.

## DISPOSITION

The judgment is affirmed.

SNAUFFER, J.

WE CONCUR:

POOCHIGIAN, ACTING P. J.

DETJEN, J.

18.